UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


                                    )
MASSACHUSETTS BAY                   )
TRANSPORTATION AUTHORITY,           )
                                    )
        Plaintiff,                  )
                                    )     Civil Action
v.                                  )     No. 08-11364-GAO
                                    )
ZACK ANDERSON, RJ RYAN,             )
ALESSANDRO CHIESA, MASSACHUSETTS    )
INSTITUTE OF TECHNOLOGY,            )
                                    )
        Defendants.                 )
                                    )



BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


MOTION HEARING



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, August 14, 2008
11 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

Dockets.Justia.com

1    APPEARANCES:

2         HOLLAND & KNIGHT LLP
          By: Ieuan-Gael Mahony, Esq.
3             Maximillian J. Bodoin, Esq.
          10 St. James Avenue - Suite 12
4         Boston, Massachusetts  02116

5         ELECTRONIC FRONTIER FOUNDATION
          By: Jennifer Stisa Granick, Esq.
6         454 Shotwell Street
          San Francisco, California  94110
7         On Behalf of the Defendants Zack Anderson, RJ Ryan
          and Alessandro Chiesa
8
          EDWARDS ANGELL PALMER & DODGE, LLP
9         By: Jeffrey Swope, Esq.
          111 Huntington Avenue
10        Boston, Massachusetts  02199
          On Behalf of the Defendant MIT
11
      Also in Attendance:   Scott Darling III, Esq.
12                          MBTA Legal Department

13                          Jaren Wilcoxson, Esq.
                            Office of the General Counsel of MIT
14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise for the United States
 3   District Court for the District of Massachusetts.  Court
 4   is now in session.
 5            You may be seated.
 6            Calling Civil Action 08-11364, MBTA versus Zack
 7   Anderson, et al.
 8            Counsel, please state your names for the record.
 9            MR. MAHONY:  Ieuan Mahony from Holland & Knight
10   for the plaintiffs, Massachusetts Bay Transportation
11   Authority.
12            MR. DARLING:  Scott Darling, in-house counsel
13   for MBTA.
14            MR. BODOIN:  Max Bodoin for the MBTA.
15            MS. GRANICK:  Good morning, your Honor.  I'm
16   Jennifer Granick from the Electronic Frontier Foundation
17   for defendants Anderson, Ryan and Chiesa.
18            MR. SWOPE:  Good morning, your Honor.  Jeffrey
19   Swope, Edwards Angell Palmer & Dodge for MIT.  With me
20   at counsel table is counsel Jaren Wilcoxson from the MIT
21   general counsel's office.
22            THE COURT:  All right.  Good morning, everyone.
23            I understand we have parties on the line as
24   well -- on the telephone line -- the defendant --
25            MS. GRANICK:  That's correct, your Honor.
```

1        THE COURT:  The student defendants.

2        MS. GRANICK:  Yes.  And I have my lawyers --

3 colleagues of mine -- from the Electronic Frontier

4 Foundation, and I believe that it's defendants Ryan and

5 Chiesa who are on the line.  Mr. Anderson is out of the

6 country and is unable to join in the hearing this

7 morning.

8        THE COURT:  Okay.  Let me just make a couple of

9 preliminary comments before we get to any of the issues

10 between the parties.

11        First of all, because there is some -- I think

12 the lawyers know all of this, but for the benefit of the

13 people in the audience who may or may not, let me just

14 set the stage why we're here and what the proceedings

15 are.

16        We have a standard procedure in this court for

17 the handling of emergency or short-notice matters.  All

18 our cases, both civil and criminal, are assigned to a

19 particular district judge by random assignment,

20 something we jealously protect.  But we have a procedure

21 if a matter comes in on an emergency basis after hours,

22 or when the assigned judge is not available, that it can

23 be referred to an emergency-duty judge.  And that's what

24 happened in this case.  The case came in late Friday,

25 and although it was assigned to me I was not available

1    immediately, and Judge Woodlock, our emergency-duty

2    judge, happened to be present.  And so that's why he

3    handled the first parts of the proceedings.  But the

4    case had been assigned to me and all further proceedings

5    will be here in front of me.  And that's entirely

6    regular under our processes.

7          But I just want to acknowledge Judge Woodlock's

8    prompt and attentive response to the matters, including

9    the extraordinary hearing on Saturday at which the

10   matters were resolved.  And I told him privately that I

11   owe him one for having done that.

12         Let me just say also from my review of the

13   papers that I appreciate the professionalism displayed

14   by counsel in the case for all the parties.  It is

15   apparent that they are, in their respective roles,

16   vigorously advocating for their clients' interests, but

17   I think so far, anyway, from what I see, adhering to the

18   high standards that we expect of counsel in these cases.

19         And just a brief word about temporary

20   restraining orders and how they fit into the process of

21   a case.  Our civil rules provide in emergency, or

22   exigent, circumstances for an application for and

23   perhaps even a grant of a motion for a temporary

24   restraining order.  Under the rules that can even be

25   made -- to use the language that lawyers use -- ex

1  parte; that is, by one side without the other, although

2  it's usually -- an effort is made to involve both sides,

3  as happened here.

4      Temporary restraining orders usually reflect, at

5  least, the movant's view that there are emergent

6  circumstances which require shortening of

7  otherwise-applicable time periods and then expediting

8  address to the merits of the motion which can involve,

9  obviously, an assessment of the merits of the underlying

10  cause of action.  Because of their rather extraordinary

11  nature, temporary restraining orders are limited in

12  duration to ten days, after which they expire of their

13  own force, unless extended -- they can be extended for

14  an additional period -- or during any of that time the

15  party -- if a restraining order is issued, the party may

16  move to extend that as a preliminary injunction, which

17  has more formal procedures attached to it sometimes, and

18  usually follows -- well, follows, perhaps, a

19  more-detailed presentation of the parties' views than is

20  practical on a short-notice temporary restraining order.

21      So in the history of this case, obviously, Judge

22  Woodlock had the hearing, granted the temporary

23  restraining order that is in the record that we're here

24  to consider.  The rules also provide that if a temporary

25  restraining order is issued -- well, actually, I'm not

1    sure it applies here, ex parte -- a party may move to

2    dissolve it on short notice.

3          Here what we have is a motion by the plaintiff

4    to amend the terms of the order issued by Judge Woodlock

5    and a motion for reconsideration filed by the

6    defendants -- at least the student defendants -- which

7    may be equivalent to a motion to dissolve.  I think the

8    objective of the reconsideration would be to withdraw

9    the restraining order.

10          There has been a late flurry of papers filed.

11    I'm not sure when -- there was a motion for a scheduling

12    conference and for some interim discovery that was

13    filed, I guess, late yesterday.  I saw it the first

14    thing early this morning.  And then there are also some

15    additional matters and formal opposition to the motion

16    to reconsider filed by the plaintiff, and accompanying

17    paper, and then a sealed document, Number 32 on the

18    docket.

19          MS. GRANICK:  Would you like me to address that

20    briefly, your Honor?

21          THE COURT:  Let me get to one other matter first

22    before we do that.  I set this hearing in response to

23    the plaintiff's motion on Monday, I guess, to amend the

24    order.  Shortly after that the hearing time was set.  I

25    think that we had the motion for reconsideration and so

1    on.  There's no -- the matter of when, within the

2    ten-day period, a hearing on such matters to amend or

3    perhaps extend or to reconsider or dissolve is something

4    that is really a scheduling matter and there's no

5    necessary particular time for it.

6         So let me raise a thought I had when I saw the

7    motion for discovery this morning, and that is whether,

8    depending on the defendants' views on this, it might be

9    appropriate to postpone the merits question in either

10   direction on the existence of the TRO to permit some

11   limited discovery such as that is moved for in the

12   plaintiff's motion.  So I guess I'm looking to the

13   defendants for a reaction to that.

14        Let me just say that what appealed to me about

15   that possibility was it would perhaps enable me to make

16   a sounder decision if I knew a little bit more about the

17   facts of the case that might be developed during

18   discovery or not.  Expedition is important on matters

19   such as this, but it is not the only value.  And the

20   soundness and rationality and evidentiary foundation for

21   any ruling in either direction are also very important

22   considerations that I think I have an obligation to take

23   account of.

24        So simply as a scheduling matter, without

25   addressing the pros and cons of the underlying issues at

1    all, I wonder whether prudence might not dictate a

2    little further information development.

3         MS. GRANICK:  Your Honor, the Court has before

4    it today all the information that it needs to decide the

5    validity of the temporary restraining order.  The issue

6    in the temporary restraining order is different from the

7    issues underlying the merits of the case.  The issue is

8    whether the restraining order is required in order to

9    prevent harm to the plaintiff.

10        And what this case is about is an

11   unconstitutional gag order, prior restraint, on my

12   clients' ability to speak about a matter of great public

13   interest.  Every day that goes by where this gag order

14   is in place is an irreparable harm to my clients and to

15   the First Amendment, yet the information -- on the other

16   side, the information that this Court has is enough to

17   know whether what my clients want to talk about will do

18   irreparable harm to the MBTA.

19        I filed this morning with the Court, and

20   provided to opposing counsel yesterday, a document which

21   is a confidential report which encompasses all the

22   findings -- all the reported findings, all the research

23   that my clients, the students, have done.  And I

24   provided that report to counsel and to the Court because

25   it seemed to me from discussions with -- from what

1  counsel was saying in the press, and from discussions

2  with him and from what Judge Woodlock was concerned

3  about on Saturday, that there was a lot of uncertainty

4  and worry about what my clients might actually say, on

5  the one hand, and some dismissiveness about whether it

6  was a prank or whether it was serious on the other.

7         And in order to make both parties -- both the

8  MBTA and the Court more comfortable with what exactly

9  we're talking about here, I have provided the Court with

10 the entire universe of information that my clients would

11 like to talk about.

12         Now, it is much more than my clients ever

13 intended to talk about.  They always intended to

14 withhold the details of their research when they were

15 going to give their talk at the conference and ongoing

16 into the future.  But this document enables the Court

17 and counsel to know that there's not going to be another

18 shoe that's going to drop sometime later on.  This is

19 what we're talking about, just the information that's in

20 this report.

21         Now, I filed it under seal also --

22         THE COURT:  Yeah.  I was just going to clarify.

23 You're talking about the sealed document that is

24 docketed as Number 32?

25         MS. GRANICK:  Yes, your Honor.  Docket No. 32.

1    And I filed it under seal because, as I said,

2  our clients never intended to reveal all of these

3  details; that was never their intention.  It was a

4  document -- it is a document that we prepared for

5  settlement purposes.  We offered to provide this

6  document since the MBTA's concern was what are these

7  students going to say.

8    But instead of engaging in this kind of

9  back-and-forth interchanging over settlement, we just

10 decided that it was important that all of the parties

11 and the Court be on the same page about what we're

12 talking about.  And that is the core of the TRO

13 question.  There needs to be no further discovery on

14 that matter; that's all there is that the Court needs to

15 be concerned about going forward.

16    And our contention, your Honor, is that looking

17 at that report -- first of all, everything in that

18 report is First-Amendment protected speech; and second

19 of all, discussing any information in that report is not

20 and cannot be a violation of the Computer Fraud and

21 Abuse Act.  And I think the Court is eminently able to

22 make that determination today given the irreparable harm

23 and the prior restraint that's imposed upon my clients

24 and the consideration that the First Amendment -- of the

25 First Amendment in this area where we're talking about a

1   gag order.

2           THE COURT:  Okay.

3           Mr. -- was that --

4           MS. GRANICK:  Yes.  I have some comments on the

5   proprietary of discovery at this point in time.

6           THE COURT:  Well, yeah.  Go ahead.  Why don't

7   you address that as well.

8           MS. GRANICK:  Okay.  Thank you, your Honor.

9           First of all, the complaint has not been served

10  on my clients yet, and this lawsuit is less than a week

11  old.  There has not been any meet-and-confer and there

12  have not been any initial disclosures.  My understanding

13  from looking at my e-mail this morning -- I was on the

14  plane yesterday coming out here from California.  It was

15  my understanding from looking at my e-mail this morning

16  that there were some disclosures made after the initial

17  discovery was propounded.  That's not appropriate under

18  the rules.

19          And, you know, there is a reason why we have

20  meet-and-confer rules and timeframes for this and

21  initial disclosures, and it's in order to allow the

22  parties, you know, some time from the time that the

23  lawsuit is filed to, you know, do service, to look at

24  all the facts and to deal with everything.

25          So these discovery requests are too soon and

1   inappropriate at this stage of the case.

2           THE COURT:  Okay.  Mr. Swope?

3           MR. SWOPE:  Thank you, your Honor.

4           The only discovery sought from MIT is the

5   deposition of Professor Rivest.  The difficulty I have

6   is Professor Rivest has a prescheduled airplane flight

7   out to the West Coast tomorrow, and he won't be back in

8   Cambridge for -- I think there's maybe one day of the

9   week after next, and then he's out in Canada and won't

10  be back until after Labor Day.

11          So there would be no way to have his deposition

12  tomorrow, and we would have to wait a week to see if he

13  could fit it in at some point the following week.

14          MS. GRANICK:  Your Honor, on a scheduling matter

15  also which I forgot to mention, it is also true that the

16  students are out for summer session, so none of them are

17  here in Boston now.  One of them's out of the country;

18  another one is scheduled to leave the country; one's on

19  the West Coast.  I mean, they're just not here now and

20  they will not be back in Boston until September.

21          THE COURT:  Mr. Mahony?

22          MR. MAHONY:  Hi, your Honor.  If I may, I'll

23  address counsel for the individual defendants' arguments

24  first.

25          Your Honor, my sister said that the Court has

1  before it all that's needed.  Your Honor -- and my

2  sister also made mention of what my clients want to talk

3  about.  And my sister's papers are full of statements

4  about "my clients' good faith" and statements from the

5  clients.

6       Your Honor, there is no declaration, affidavit,

7  any statement by the individual defendants before the

8  Court at all.  All of those statements that my sister

9  made about what her clients want, what they intend to do

10  are simply statements; they're not evidence.  And

11  there's no evidence before the Court.  So that's one

12  point.

13      The second point, your Honor:  My sister

14  mentions a gag order.  Your Honor, there's a conflict in

15  the position that the EFF is taking.  First, I hear from

16  my sister that the individual defendants never intended,

17  and don't intend, to reveal the key information that

18  they have which we believe, at least in partial review,

19  because it's a complex document, is in that sealed

20  document.  So there's a statement that the individual

21  defendants don't intend to reveal the key information,

22  and that means the other information they do intend to

23  reveal, but that other information is public domain, of

24  low sensitivity, that is not a concern.

25      Your Honor, that's precisely what the TRO says:

PDF created with pdfFactory trial version www.pdffactory.com

 1  Do not reveal -- and our motion on Monday was intended

 2  to make that crystal clear.  In contrast to that, the

 3  findings and rulings of Judge Woodlock, we understood

 4  the TRO to say:  You can talk about things in the public

 5  domain, just don't reveal the key information, the key

 6  details.  The motion that the Court has before it is

 7  intended to emphasize that again.

 8          So, your Honor, there is no gag order.  There's

 9  no harm to the particular defendants here from the TRO

10  because they've already said, "We don't want to talk --

11  we don't intend to talk -- about the key information."

12  That's the only information we care about.

13          Your Honor, in terms of the document under

14  seal -- I'm sure we'll get to this in more detail --

15  it's a complex document.  I received it last night.  We

16  do think, your Honor, that the provision of that

17  information is a good step forward in this case.  Our

18  papers are perhaps too detailed about the efforts that

19  we've gone through to try and pull the information from

20  the defendants.

21          There is still a good deal of information out

22  there, your Honor; for example, there's a source code

23  that's referenced in the presentation that we don't

24  have; there's the A paper that Professor Rivest -- that

25  they did for Professor Rivest, that we've been refused;

1  therefore, your Honor, there is a range of discovery, a

2  range of information, that we don't have that the Court

3  doesn't have the benefit of.

4       And when I say "range," your Honor, in our

5  discovery requests we've tried to be quite targeted.

6  The easiest way to look at that targeted intent, and

7  hopefully accomplishment, is the length of the

8  depositions.  We stated for Mr. Anderson, who's the lead

9  defendant, the lead individual defendant, a four-hour

10  deposition, and for Professor Rivest a two-hour

11  deposition.  So when Mr. Swope says he'll be unavailable

12  but maybe a week from now we could fit it in, that is

13  literally correct, your Honor, because we're only asking

14  for two hours.  And we're happy to go to his office or

15  wherever it's convenient for him to be scheduled.

16       Now, your Honor, let me turn briefly to the

17  technical arguments that my sister makes about service.

18  Your Honor, back last weekend all of the individual

19  defendants were out in Las Vegas.  We had retained local

20  counsel in Las Vegas who had a private investigator

21  ready to serve the defendants with the TRO.  My sister,

22  on the record -- and Judge Woodlock confirmed with her

23  and with the individual defendants that they had notice,

24  that they understood that they were subject to the TRO.

25  I spoke with my sister on the phone, and I confirmed it

1   with an e-mail, that service was not required on her

2   clients.  So if that's changed, that's something that

3   needs to be addressed, but I think it's wholly

4   inappropriate.

5          Second, in terms of meet-and-confer?  Your

6   Honor, again, I view -- we view that document under seal

7   as a good step forward in terms of getting the parties

8   to talk.  We have a huge interest in understanding what

9   the exposure is, what's going on.  But, your Honor,

10  there is -- you know, for example, that A paper, there

11  are some things where talking just isn't working.

12         A meet-and-confer is a limited utility at this

13  point.  A structure from the Court would be very

14  helpful.  And the point that an evidentiary -- better

15  evidentiary record assists everyone, we strongly agree

16  with.

17         Thank you, your Honor.

18         THE COURT:  Well, let me just press a little

19  further on that point.  It may be, given the

20  practicalities, that oral depositions are not easily

21  accomplished on the time frame that I'm having in mind.

22  What I was contemplating is not something that would be

23  on the other side of a week from now, as Mr. Swope

24  refers to, but the oral depositions are only part of

25  what's requested.  There is also a document request, and

1   there are at least a couple of things on that that would

2   seem to be available to be produced that might be

3   illuminating.  And, of course, chief among those would

4   be the paper.  I think just to flush it out,

5   maybe some -- and I'm looking at -- there's an exhibit

6   to the request that is a proposed service of document

7   request.

8         The other thing that occurs to me that might be

9   readily available and illuminating, potentially, would

10  be communications between the defendants, the

11  undergrads, and DefCon about the content of the

12  presentation.

13        So, now, let me just say with respect to the

14  argument that the Court's scheduling of events on the

15  hearing related to the TRO requires resolution of

16  whatever issues there are with respect to the First

17  Amendment I think is -- under the circumstances, anyway,

18  where there is no event on the horizon, as there was on

19  Friday and Saturday, is not particularly -- that is not

20  particularly germane to the scheduling question.  In

21  other words, my suggestion is not to resolve any of the

22  substantive issues until -- strike the "until" -- but on

23  a sensible schedule within the scope of the force of the

24  TRO that permits an address to those issues which

25  include, perhaps, the First Amendment issue.

1    But I'm not inclined, at least on the facts as I

2  understand them, to first consider the merits of the

3  First Amendment claim in order to decide what our

4  schedule should be as long as we are operating within

5  the ten-day period under the rules.

6    That said, let me just ask about the feasibility

7  as a practical matter now, and any other substantive

8  objections there might be, to the production of those

9  limited items.  Let me just look at the -- if you

10 have -- it is Exhibit 1 to Docket No. 28, which is the

11 plaintiff's request for an interim discovery order.

12 Those matters -- that would be under -- basically, very

13 limited -- under 1.1, 1.2 and 2.1.  I don't know if you

14 have it with you.  I can read it for you if you don't

15 have it in front of you.

16    MS. GRANICK:  I know which documents you are

17 referring to, your Honor.

18    THE COURT:  It is basically the communications

19 between the undergrads and DefCon and a copy of the

20 class paper.

21    MS. GRANICK:  I understand, your Honor.  Federal

22 Rule of Civil Procedure 34 says that a minimum of 30

23 days' notice is required for document requests.  It's

24 simply untimely.

25    THE COURT:  The discovery rules also say that

1   the Court can set any schedule for good reason.  So I

2   mean, if it's a question of authority, there's no

3   question that I have the authority in a sort of

4   expedited emergency -- the rules also allow, indeed

5   permit, discovery before the action is brought, in some

6   circumstances.  So there's wide latitude.  So I don't

7   have any doubt of my ability to do that, so...

8         MS. GRANICK:  I understand.  But my point is,

9   your Honor, that the discovery that's sought goes to the

10   underlying merits of the case and not to the issues that

11   are before the Court for either a TRO or a preliminary

12   injunction.  So there's no reason to change the Rule

13   34 --

14         THE COURT:  Well, but the underlying merits of

15   the case are a key consideration in whether the

16   plaintiffs have met the burden required for obtaining a

17   TRO, or continuing it, once obtained, and that is the

18   likelihood of success on the merits.  So it's necessary

19   to consider the merits of the case.

20         MS. GRANICK:  That's correct, your Honor.  Only

21   if the plaintiffs have come here and presented the Court

22   with a valid legal theory on which relief may be based.

23   And there is a manifest legal error that underlies Judge

24   Woodlock's TRO which needs to be addressed by this Court

25   and can be addressed without any reference to other

1     documents.  And that underlying fallacy is the idea that

2     the Computer Fraud and Abuse Act prevents the

3     distribution of information.

4         What plaintiff is claiming is that there is a

5     notion of responsible disclosure, which they define as

6     you disclose everything to MBTA and wait until they've

7     had a chance to fix it, and that that notion is

8     enshrined in law in the CFAA and that it's consistent

9     with the First Amendment.  That is wrong.

10        First of all, responsible disclosure is --

11    responsible disclosure is what the students engaged in

12    here.  They never intended and -- at the talk at DefCon

13    to reveal the information that they believed was the

14    important piece of information that would allow or teach

15    a bad guy to circumvent the system and to get free

16    subway rides from the MBTA.

17        That withholding was responsible.  And there's a

18    letter in the -- from 11 renowned computer science

19    professors and computer scientists which says that this

20    is how computer science security research is done.  It's

21    how it's done every day.  There are hundreds of

22    conferences --

23        THE COURT:  Let me just interrupt because I

24    understand that that's your argument on the merits of

25    the questions that are going to be presented, and you

1    may well be right, but my discovery-related comments are

2    made without getting to -- in other words, what I'm

3    talking about is a way of getting to a reliable, from my

4    point of view, information base on which to address the

5    merits questions.  And so to address the merits

6    questions to decide whether I need discovery I think has

7    it backwards.

8         What I'm talking about is being sure that I can

9    have a sufficient understanding of both parties'

10   positions so that I can, as I say, reliably resolve the

11   merits questions which include:  Is this a lawful TRO?

12   That's your question.  And your position is it's not.

13   You may be right.  My question is setting a schedule and

14   developing the information that will help me make a good

15   call on that point.

16        MS. GRANICK:  Whether it's a lawful TRO, your

17   Honor, is a question of law, not of fact.  It's a

18   question that discovery will not help us answer.  And

19   forcing the defendants to go through a bunch of

20   discovery when the underlying legal theory of the

21   case -- the claim that is the only claim that gives this

22   Court jurisdiction over the case -- is flawed, is

23   putting the cart before the horse.

24        And they have to show this Court before they can

25   continue the TRO, before they can seek discovery, that

the CFAA claim is valid.  And the CFAA claim is not
valid.  Because if you look at the plain language of the
statute, the legislative history and all of that, it
very clearly shows that the transmission of information
can't be to the public in a conference; it has to be a
human-protected computer.

And it's a provision that Congress added not to
enshrine some notion of responsible disclosure in the
law.  CFAA, this provision of it, well predates all the
debates in the security community about responsible
disclosure.  It was a provision that was added in order
to protect computers from viruses and worms.  And the
plaintiff is misreading that provision to squelch speech
at a conference.

That is not something on which this Court needs
to take discovery.  Those are legal matters that this
Court can decide -- and indeed has to decide -- right
now because of the First Amendment harm that's ongoing.

THE COURT:  Okay.  Before I go back to Mr.
Mahony, Mr. Swope, anything on that question?

MR. SWOPE:  No, your Honor.  The document
request is not to MIT.

MR. MAHONY:  Your Honor, if I could simply add
the two more document requests at 5.4 and 5.5?  The 1.1
and 1.2 and 2.1 the Court suggested is fine for the

1  MBTA's purpose on an interim basis; the 5.4 -- and

2  5.5 -- which asks for the code that's referenced in the

3  materials; and the 5.5 is just a catch-all to say:  If

4  there's anything else you're planning on providing at

5  that conference, let us take a look at it.

6          And, your Honor, I would like go back to the

7  deposition question to see if there's a way maybe we

8  could do a telephonic deposition, if folks are

9  unavailable.  In other words, the goal here is if we

10 can't have face-to-face -- we've already went down to

11 four hours and two hours, if we can't have face-to-face,

12 your Honor, we're willing to work to get something, you

13 know, second best, again, for this interim -- you know,

14 for this in-between or beginning phase.

15          THE COURT:  Okay.

16          MS. GRANICK:  Your Honor, I just -- if -- before

17 the Court does a serious consideration of this, if this

18 is what the Court is considering, which is to continue

19 the TRO --

20          THE COURT:  No, I would not continue the TRO.

21 I'd do nothing to the TRO.  The TRO continues on its

22 own.  That's my whole point.  I am not reaching the

23 question under this plan.  There's no implicit approval

24 of the TRO; it is simply deferring to permit development

25 of information at which that question will be

1  considered.

2         And maybe to reduce anxiety, I should tell you

3  the schedule I am thinking of is to continue this only

4  until next Tuesday, so a very short period of time, well

5  within the ten days of the duration of the TRO.

6         MR. MAHONY:  And what would -- would the thought

7  on Tuesday be that we'd have this same hearing and maybe

8  we could supplement, because we certainly want to move

9  to convert this to a protective order.

10        THE COURT:  I guess to flush out more details.

11 I'm talking about very limited document discovery which

12 I -- is as forthwith as can be -- I don't know what the

13 practicalities are in that -- and then the parties to

14 submit anything that they want to say about that, I

15 mean, by, I guess, the close of business on Monday, and

16 then we'll take it up on Tuesday morning.  That would be

17 my thought.  We can pick one day or the other, I guess,

18 to do it.

19        MR. MAHONY:  So that the papers for the Tuesday

20 hearing would be due Monday, and the discovery would be

21 Friday --

22        THE COURT:  Not later than the end of business

23 tomorrow.

24        MR. MAHONY:  That's wonderful.

25        THE COURT:  That's my thought.

1          MS. GRANICK:  Your Honor, it just -- as a

2     practical matter it is highly impractical.  One of our

3     clients is out of the country; another of our clients is

4     neither in Boston nor in San Francisco, where our

5     offices are; we are losing one of our clients to another

6     overseas trip, since they're on their summer break, I

7     think on Monday of next week; I am going to be flying

8     back to San Francisco all day today and then we have the

9     weekend which intervenes.  So this is -- it's going to

10    be extremely difficult for us to pull this information

11    together before Monday.

12          I also think that, you know, as I said, it does

13    not weigh upon the issues that are before this Court.

14    And then one of the lawyers from our office -- it

15    actually can't be me because I am going to be flying on

16    this weekend -- will have to come back here to Boston in

17    order to appear before the Court and argue these issues.

18          So I don't -- I mean, I don't understand how the

19    documents that are the subject of plaintiff's request

20    weigh upon the issues of whether this TRO is, A -- has

21    legal basis under the CFAA; and, B, is in accordance

22    with the First Amendment, because those are factual

23    issues, and what the plaintiff needs to show is that

24    it's legally appropriate.

25          THE COURT:  Well, I've already addressed the --

1   whether this would involve -- the scheduling decision

2   would involve consideration of the First Amendment.

3         Let me just say I don't think you're right about

4   the fact that it's a pure legal question.  The question

5   in any case is whether -- unless it's a -- you know, you

6   might have an objection that the statute is invalid or

7   on its face it can't cover the range of possibilities on

8   the facts, but usually the question on a case is whether

9   on the facts as pled does the plaintiff have a cause of

10   actions as alleged under the cited authority.  And so

11   there's always a mixed question of fact and law.

12         The legal meaning of the -- or the legal scope

13   of the statute, properly understood, obviously has

14   something to do with deciding whether the facts that the

15   plaintiff pleads fit within the proper scope so that

16   there's relief, but it can't be a pure legal question.

17         MS. GRANICK:  Your Honor, assuming all the facts

18   that plaintiff has alleged are true -- assuming for the

19   sake of argument they are all true -- there is no claim.

20   There's a pure legal question.  And this Court can

21   address that.  It has absolutely nothing to do with the

22   factual allegations.  If everything in the plaintiff's

23   complaint and everything that they've argued is true,

24   the CFAA doesn't cover it because the CFAA, by its very

25   terms as a legal -- pure legal matter -- does not cover

PDF created with pdfFactory trial version www.pdffactory.com

the transmission of information to people; it only

covers the transmission of information to a protected

computer.  So there is no factual dispute here for the

purposes of this TRO.

We're assuming, for the sake of argument, that

everything they say is true.  It's a pure legal question

as it's a First Amendment question.

THE COURT:  Okay.  I understand your point but

I'm not in agreement with it because, even as you say

it, what you're saying is that, on the facts they pled,

there's not a legal remedy, which is, of course, a fact

and legal question.

But anyway, let me --

MS. GRANICK:  Your Honor, if you -- I would --

I'm sorry.

THE COURT:  Let me consider your practical

considerations.  I mean, the class paper I would assume

is easily available.  I mean, if not from you, then they

can serve Mr. Swope, and he has a copy, I assume.

MR. SWOPE:  We do have a copy, your Honor.  The

federal educational -- the Family Education Rights and

Privacy Act say the students have to be given notice,

which I guess they're getting now, and have a right to

object, which I guess they can do now, and your Honor

can rule on it.  We do have a copy, obviously, but I

1  assume your Honor will go through the appropriate dance

2  for us to provide it.

3  THE COURT:  Okay.  If it can't be produced by

4  the students, and I don't know what the practicalities

5  are, and nor --

6  MS. GRANICK:  Your Honor, everything that's in

7  that paper and more is contained in the document that I

8  provided to the Court and to --

9  THE COURT:  Well, that's one thing I'm

10  interested in, is how they compare, frankly.  If they're

11  the same, that's one thing; if they're not the same, I

12  might be interested in the differences.  They might be,

13  too, but I am.

14  MS. GRANICK:  How could those differences weigh

15  upon the question of the validity of the claim?

16  THE COURT:  I don't know.  I don't know what

17  they are.

18  Anyway, let's do this:  I will grant the request

19  for discovery as outlined in 1.1, 1.2, 2.1, 5.4 and 5.5

20  understanding that the defendants have to use reasonable

21  efforts to comply.  If they're unable, for practical

22  reasons, reasonably to comply, then they may state those

23  circumstances which make it difficult to comply.  But at

24  least we'll get that answer.  So I would say by, say --

25  why don't we say by four o'clock Eastern time tomorrow,

1    either production or otherwise a response.  And then

2    we'll permit the parties to evaluate that.

3            And we'll continue this hearing on Tuesday, the

4    19th.  Why don't we say --

5            I think I have something at ten, Gina?

6            THE CLERK:  Yes.

7            THE COURT:  Why don't we say 10:30 on Tuesday

8    morning.

9            MS. GRANICK:  Your Honor, we are intending to

10   seek a writ to the First Appellate -- the First Circuit

11   Court of Appeals.  Can I ask the Court to stay this

12   discovery order to give us an opportunity to seek that

13   writ?

14           THE COURT:  You can ask, but the request is

15   denied.

16           MS. GRANICK:  Thank you, your Honor.

17           THE COURT:  Okay.  I'll see you Tuesday morning.

18           THE CLERK:  All rise.

19           Court is now in recess.

20           (The proceedings adjourned at 11:46 a.m.)

21

22

23

24

25

1              C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official

4    Reporter of the United States District Court, do hereby

5    certify that the foregoing transcript constitutes, to

6    the best of my skill and ability, a true and accurate

7    transcription of my stenotype notes taken in the matter

8    of Civil Action No. 08-11364-GAO, MBTA v. Zack Anderson,

9    et al.

10

11                    /s/ Marcia G. Patrisso
                      MARCIA G. PATRISSO, RMR, CRR
12                    Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25