UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY,

          Plaintiff,

v.

ZACK ANDERSON, RJ RYAN,
ALESSANDRO CHIESA, and the
MASSACHUSETTS INSTITUTE OF
TECHNOLOGY,

          Defendants.

Civil Action No. 08-11364-GAO

**DEFENDANTS' MOTION FOR RECONSIDERATION AND/OR
MODIFICATION OF AUGUST 14, 2008 DISCOVERY ORDER**

## INTRODUCTION

Defendants Zack Anderson, Alessandro Chiesa and RJ Ryan ("Defendants" or "the students") respectfully move for this Court to reconsider its August 14 Interim Discovery Order directing Defendants to produce an unpublished student research paper and related unpublished research materials pursuant to Plaintiff's requests for documents numbered 2.1 and 5.4 ("Discovery Order").[1] First and foremost, Plaintiff has failed to state a claim upon which relief can be granted under the Computer Fraud and Abuse Act, *see* Mot. for Reconsideration of TRO at 9-12, and thus any discovery at all is unwarranted and improper. Moreover, the Discovery Order runs directly contrary to the law of this Circuit as set forth in *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir.1998), and violates the First Amendment prohibition against pre-publication review. In essence, it unjustifiably allows the Massachusetts Bay Transportation Authority ("MBTA") to use the discovery process to demand and review the students' research, a request they made before Judge Woodlock on August 8, and which he rejected.[2] Justice delayed may sometimes be justice denied, but rushed decisions can also inadvertently deny justice. For the reasons explained in detail below, the students respectfully request that this Court reconsider or modify the order issued on August 14, 2008.

## BACKGROUND

As the Court is familiar with the background of this fast-moving dispute, Defendants will address only the most pertinent facts and procedural history here. Defense counsel and the Court were first presented with the discovery requests and Rule

---

[1] Subject to and without waiving objections not germane to this Motion, the students produced documents responsive to requests 1.1 and 1.2, *i.e.,* communications with the DEFCON organizers. Due to the short time frame for responding to the request, the students were unable to provide materials responsive to request 5.5 in time.

[2] Specifically, the MBTA requested, without providing advanced notice to the students of the hearing, an emergency court order prohibiting the students, *inter alia*, "[f]rom declining to provide the MBTA and its vendors with information sufficient to replicate, test, and repair the purported security flaws in the Fare Media system."

2

16 motion just minutes before the August 14 hearing. The late filing ensured that defense counsel had no opportunity to review the arguments presented in the papers before the hearing on the motion. Given the shortened time-frame, neither the parties nor the Court had an opportunity to apply the test for production of pre-publication research required by *Cusumano v. Microsoft* and its progeny or address the First Amendment issues raised by the discovery request. As a result, the Discovery Order was based on a manifest error of law that must be corrected.

Currently pending before the Court is a Motion for Reconsideration of a Temporary Restraining Order as well as a Motion to Modify Terms But Not Duration of Temporary Restraining Order (Dkt. No. 16). The hearing on these motions was scheduled for August 14, 2008, and then continued until August 19. On the afternoon of August 13, the Massachusetts Bay Transportation Authority ("MBTA") issued a series of discovery requests—just five days after filing its Complaint on August 8, and prior to any Rule 16 or Rule 26 conference. Less than 24 hours later, just minutes before the August 14, 2008 hearing, Plaintiff's counsel handed the students' counsel a copy of Plaintiff's motion for an "Interim Scheduling Order requiring the defendants to comply with the pending discovery." (Dkt. No. 28.) On August 14, this Court continued the hearing on Defendants' Motion to for Reconsideration and ordered the students to respond to some of the MBTA's discovery requests. Specifically, the Court ordered the students to produce or respond to the discovery requests seeking a research paper, related research materials, and communications with DEFCON conference organizers, initially by 4 pm ET on Friday, August 15, 2008. The Court subsequently extended the response deadline to 7:00 pm ET on August 16.

**STANDARD FOR GRANTING A MOTION FOR RECONSIDERATION**

A court may grant a motion for reconsideration when the court has misunderstood a party, or there is a significant change in the law or facts since the submission of the issues to the court by the parties. *Reyes Canada v. Rey Hernandez*, 224 F.R.D. 46, 48 (D.P.R. 2004) (citing *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)). Under Fed. R. Civ. P. 59(e), a party may direct the district court's attention to newly discovered material evidence or a manifest error of law or fact enabling the court to correct its own errors. *Aybar v. Crispin-Reyes*, 118 F.3d 10, 15 (1st Cir. 1997).

**ARGUMENT**

**A. The Discovery Order Was Based On a Manifest Error of Law Because the Court Failed to Apply the Balancing Test Required by This Circuit.**

After failing to get a court order requiring the students to provide information directly, the MBTA is now seeking to use discovery to obtain the research paper that the students submitted to MIT Professor Ronald Rivest regarding MBTA security vulnerabilities (the "Class Paper"), as well as copies of software and other materials relating to the research that the students intended to discuss at DEFCON. The MBTA appears to be motivated by a misguided notion that the law somehow requires that the students show the agency all of their academic research.[4] While the students intended to disseminate a *version* of their research to the public, none of this preliminary material has been published. Declaration of Russell J. Ryan ("Ryan Decl.") ¶¶ 4-5, 7. Thus, the material remains privileged.

The unpublished academic materials sought in MBTA's discovery request are privileged under the law of this Circuit. The First Circuit has established that in the

---

[4] Whether or not the students should, as good citizens, help the MBTA is not the issue. The students want to help the MBTA. It is undisputed that the students voluntarily met with the MBTA on August 4, and provided an extensive security analysis to the MBTA. (*See* Dkt. No. 32.)

course of conducting the balancing test articulated in Rule 26(b)(2)(c)(iii), the Court must consider whether the materials sought comprise confidential information entitled to special consideration and then must determine "the type and kind of protection" afforded to them. *In re Bextra and Celebrex Mktng. Sales Practices and Prod. Liab. Litig.*, 249 F.R.D. 8, 12 (D.Mass. 2008) (citing *Cusumano v. Microsoft*, 162 F.3d 708, 714 (1st Cir. 1998). Under *Cusumano*, parties may not use the discovery process to obtain pre-publication review of unpublished academic research unless the discovery request can pass a balancing test. First, the party seeking pre-publication information compiled by an academic researcher must first make a *prima facie* showing that its "claim of need and relevance is not frivolous." *Id.* at 716.

Upon such a showing, the burden shifts to the objector to demonstrate the basis for withholding the information. The court then must "place those factors that relate to the movant's need for the information on one pan of the scales and those that reflect the objector's interest in confidentiality and the potential injury to the free flow of information that disclosure portends on the opposite pan." *Id.; see also In re Bextra*, 249 F.R.D. at 15 (publisher need not respond to subpoena seeking communications between publisher and authors of articles concerning peer review of author's studies of the medical drugs at issue in litigation). *Cusumano* and *In re Bextra* involved discovery under Rule 45, but the principles behind the rulings apply equally to the materials sought from the students here in light of the serious First Amendment issues raised by this case.

In *Cusumano,* the court affirmed the denial of a motion to compel responses to a subpoena issued by Microsoft Corporation for notes, tapes, and transcripts of interviews relating to a forthcoming book on then-pending antitrust litigation between Microsoft and the U.S. government. The court noted, *inter alia*, that requiring production of such material could chill the future scholarly research efforts, impairing in turn the free flow of information to the public:

5

> Courts afford journalists a measure of protection from discovery initiatives in order not to undermine their ability to gather and disseminate information. Journalists are the personification of a free press, and to withhold such protection would invite a "chilling effect on speech," *id.,* and thus destabilize the First Amendment. The same concerns suggest that courts ought to offer similar protection to academicians engaged in scholarly research. After all, scholars too are information gatherers and disseminators.

*Cusumano*, 162 F.3d at 714 (citation omitted); *see also Summit Tech., Inc. v. Healthcare Capital Group, Inc*., 141 F.R.D. 381 (D. Mass. 1992) (finding that the reports of an investment analyst whose business was to perform independent research and analysis of publicly traded companies for institutional investors were entitled to protection under the reporter's privilege, since they involved the dissemination of investigative information to the public).

In *In re Bextra,* the District Court of Massachusetts held that a third party academic publisher need not produce communications between a publisher and authors of articles concerning drugs at issue in litigation, noting that the disclosure requested, which included peer review comments, "will be harmful to the [journal's] ability to fulfill both its journalistic and scholarly missions, and by extension harmful to the medical and scientific communities, and to the public interest." 249 F.R.D. at 14.

This test should have been applied here. Neither the interviews in *Cusumano* nor the peer review comments in *In re Bextra* were perfectly confidential, but each was sufficiently far along the continuum of confidentiality to justify inquiry into whether the materials should be privileged. As in *Cusumano* and *In re Bextra,* the materials sought here are privileged because the students had an expectation that they would be kept confidential. The students submitted the Class Paper, along with draft code for a single research tool, to Professor Rivest and the Computer and Network Security course staff. Ryan Decl ¶ 2. The students also gave a presentation to their classmates describing their research. *Id*. The Class Paper was also posted online briefly at a private link so it could be easily accessed by a DEFCON conference organizer in connection with the student's

6

application to present the information in a talk at the conference. Ryan Decl. ¶ 3. The students did not otherwise publish the Class Paper. Ryan Decl. ¶ 4. Nor were the research materials published. Ryan Decl. ¶ 5. The students never decided what research materials, if any, they would include in their final presentation at DEFCON. Ryan Decl. ¶ 6. Their efforts to re-evaluate the materials after the MBTA expressed its concerns delayed the decision-making process and, in light of those concerns and the subsequent filing of this lawsuit, the students ultimately did not finalize any software or demonstration plans for the DEFCON presentation. *Id*. Like the *Cusumano* interviews and the *In re Bextra* comments, here the students expected that their Class Paper, drafted software and demonstration would be confidential or shared only with their professor and course staff. The Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, protects student papers from unauthorized disclosure and the students reasonably expected that the Class Paper would not be shared more widely.

As with the documents sought in *In re Bextra* and *Cusumano*, the material is confidential pre-publication material. *Cusumano* withheld discovery of interviews and drafts to prevent a chilling effect on book authors. *In re Bextra* withheld discovery of communications about peer reviews on journal articles to prevent a chilling effect on medical research. This Court should withhold discovery of a class paper that was an unpublished precursor to a proposed talk to prevent a chilling effect on students and other academic researchers who intend to share information at conferences. See *In re Bextra*, 249 F.R.D. at 12.

Further, even where material is not confidential, courts are required to proceed with extreme caution. *Cusumano*, 162 F.3d at 714 (where discovery request seeks only nonconfidential information from researchers, there is "a lurking and subtle threat to journalists and their employers if disclosure of outtakes, notes, and other unused information, even if nonconfidential, becomes routine and casually, if not cavalierly,

compelled.") (quoting *United States v. LaRouche Campaign*, 841 F.2d 1176 (1st Cir. 1988). Thus, this Court must apply the *Cusumano* test before compelling discovery.

MBTA's requests do not pass muster, particularly at this stage in the litigation. The MBTA has not met its burden to demonstrate its need for the material. The pending motion for reconsideration[5] depends on two main questions: whether the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(5)(A), a statute targeting unauthorized access to computers, encompasses the communication of information to other individuals; and whether the continued enforcement of a gag order on the dissemination of academic research is a permissible prior restraint in light of the First Amendment and binding Supreme Court precedent. As set forth in Defendants' Motion for Reconsideration of the Temporary Restraining Order (Dkt. No. 23), the answer to both questions is "no."

Further, all this Court can enjoin is what the students are going to say in the future. Thus, the factual issues before the Court must be tethered to the question of what the students will say moving forward. The Court and the MBTA already know exactly what the students want the right to say. Specifically, the students have submitted a detailed confidential "Security Analysis" report detailing everything they would want to the right say about the MBTA's security systems, including details they do not intend to reveal to the public.[6] (Dkt. No. 32.) It is undisputed that DEFCON is over, and the students' presentation was never given. Nor are the students scheduled to give the

---

[5] The MBTA also asserts that it "currently plans to move this Court to convert the TRO to a Preliminary Injunction on or before Tuesday, August 19." Pl. Request for Rule 16 Scheduling Conference and Interim Discovery Order ¶ 1 (Dkt. No. 28).

[6] It is undisputed that the students have continually asserted that they would leave out key details in any public disclosure. *See, e.g.,* Supplemental Declaration of Richard Sullivan ¶ 5 (Dkt. No. 37); Declaration of Scott Henderson ¶ 11 (Dkt. No. 10). Moreover, the MBTA asserts that the information provided publicly so far is not sensitive. Pl. Opp. to Cross Mot. for Reconsideration 5-6 (Dkt. No. 30).

8

presentation at any point the future. Whether the student's speech can constitutionally be enjoined requires only the review of the actual proposed speech.[7] (Dkt. No. 32).

The MBTA takes a different view. Citing no law (for there is none), the MBTA has asserted a right to "determine what relevant, nonpublic information exists, and to obtain the 'disclosure' element of the 'Responsible Disclosure.'" Pl. Request for Rule 16 Scheduling Conference and Interim Discovery Order ¶ 7 (Dkt. No. 28). The MBTA also asserts that it "is entitled to discovery to test and verify the MIT Undergrads' disclosure." *Id.* at ¶ 9; *see also* ¶ 13 (questioning whether the students are engaged in a "prank"). These arguments are meritless. No court has ever based an injunction merely on what information *exists*. Indeed, the students do not dispute that a security vulnerability *exists*. If a flaw does not exist, and the MBTA is not in danger of losing fares, this would be a reason *not* to issue an injunction, but it would not help the MBTA's case in any way. *See In re Bextra*, 249 F.R.D. at 14 (denying discovery where, *inter alia,* information sought is of limited probative value). Second, to the extent that the MBTA's purpose really is to test whether vulnerability exists, this is properly the subject of expert testimony reviewing the MBTA's system. *Id.* at 12 (drug company not entitled to coopt the expertise of others in lieu of or in addition to hiring its own experts to attack the plaintiffs theories).

In addition, the MBTA's argument that it is "entitled to discovery to demonstrate that the MIT Undergrads in fact were not forthcoming about their plans" (Dkt. No. 28 at ¶ 13) is meritless. It is based on the unconstitutional notion that the MBTA, a government agency, is legally *entitled* to pre-publication review of the student's "plans." *See Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) and discussion in Section B below.

---

[7] Accordingly, the MBTA's argument that it needs the material to show the "existence of improper 'advocacy of illegal activity'" to respond to the students' First Amendment arguments fails. Pl. Request for Rule 16 Scheduling Conference and Interim Discovery Order ¶ 11 (Dkt. No. 28). The Court can decide for itself whether the "Security Analysis" is protected speech, based on the document's actual content.

Furthermore, after this Court ruled on the MBTA's motion, new facts have come to light, showing that the root of this lawsuit appears to be a simple misunderstanding. Much of the MBTA's motion was premised on the argument that the students allegedly promised to provide certain information to the MBTA and did not do so. *See* Pl. Request for Rule 16 Scheduling Conference and Interim Discovery Order ¶¶ 8, 12 (Dkt. No. 28); *see also* MBTA Media Statement (asserting that "[t]he MIT Undergrads … promised … to provide the MBTA with a copy of the Presentation. When no call or information was forthcoming, the MBTA instructed its legal counsel to begin drafting Court papers, *so that the MBTA could obtain this information*.") (emphasis added).[8]

Even if that were a valid basis for these discovery requests (which it is not, see discussion *supra*), the Supplemental Declaration of Richard Sullivan clarifies that that, at the August 4 meeting between the MBTA and the students, he:

> asked the students to prepare a written summary of every vulnerability that they claimed to have discovered and how to fix these vulnerabilities. The MIT Undergrads agreed to provide me with such a paper *within two weeks* [i.e. August 18].

Supp. Sullivan Decl. (Dkt. No. 37) at ¶ 7; *compare* Kelly Decl. (Dkt. No. 6) at ¶¶ 23-24 (discussing a request for further information made to Prof. Rivest) and Henderson Decl. (Dkt. No. 10) (not specifying when or to whom he made a request for the presentation materials). Notably, neither Henderson nor Kelley was at the August 4 meeting. *See* Sullivan Decl. ¶¶ 6-7 (Dkt. No. 4). Accordingly, it appears that a key basis for the discovery request is a misunderstanding of what the student agreed to provide after the August 4 meeting.

Finally, it is undisputed that the MBTA has had the June 30 slides outlining the students' original proposed presentation for more than a week. (Dkt. No. 9-7.) The students never finally decided what research materials, if any, they would demonstrate at

---

[8] *Available at* http://www-tech.mit.edu/V128/N30/subway/MBTA-press-office-fact-sheet.pdf.

DEFCON, and do not currently intend to demonstrate any such materials. Ryan Decl. ¶¶ 6-8. Thus, the MBTA does not need the requested pre-publication research materials to assess the potential harm of any presentation if the injunction does not issue (assuming that there would be a presentation, which is disputed). And even if the material requested were minimally relevant to the merits of the underlying CFAA claim (assuming the claim was legally cognizable, which it is not), detailed information about the students' research is already available to MBTA. (*See* Dkt. No. 32.)

Even if the MBTA could make a prima facie showing of need, the court must still balance that purported need against the harm of ordering disclosure. That harm is extraordinary here. Researchers, especially students, depend on the ability to share and test ideas with each other and their professors without fear that their initial thoughts and related evidence might be disclosed.[9] *See Healy v. James*, 408 U.S. 169, 180 (1972) ("The college classroom with its surrounding environs is peculiarly the marketplace of ideas" and therefore entitled to vigilant First Amendment protection) (internal quotation marks and citation omitted). The Class Paper was written by the students with the expectation that Professor Rivest and the course staff would be its reviewers. Ryan Decl. ¶ 2.

---

[9] Indeed, an essential component of academic freedom is the ability to control not just what one publishes, but what one does *not* choose to publish. That is why, for example, the American Association of University Professors has long affirmed that all copyrights in scholarly works must vest in the researchers themselves, rather than their institutional employers. *See* American Association of University Professors, *Statement on Copyright*, available at www.hendrix.edu/WorkArea/linkit. aspx?LinkIdentifier=id&ItemID=14642 (last visited Aug. 15, 2008) ("[copyright ownership included] the powers, for example, to decide where the work is to be published, to edit and otherwise revise it . . . and indeed to censor and forbid dissemination of the work altogether. Such powers, so deeply inconsistent with fundamental principles of academic freedom, cannot rest with the institution."); *see also, e.g., Patent and Copyright Agreement for Stanford Personnel*; *available at* http://www.stanford.edu/dept/DoR/rph/su18.html (last visited Aug. 15, 2008); *see generally* Rochelle Dreyfuss, *The Creative Employee and the Copyright Act of 1976*, 54 U. CHI. L.R. 590, 612-614 (1987).

11

Imagine how hard it would be for academics to produce class papers or other pre-publication drafts if they believed that the subject of their research later could be subject to compelled disclosure in a lawsuit. Like the peer review system described in *In re Bextra*, the conference review system is essential to the exchange of academic research. Similarly, the pedagogical process depends on a degree of shelter from outside scrutiny. *See Keyeshian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."); *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("Teachers and students must always remain free to inquire, to study and to evaluate.").

That shelter is particularly important in security research. Security researchers are well aware that the companies that create and use the systems that the researchers study would like nothing more than to get their hands on preliminary research before the researchers themselves have a chance to fully evaluate and assess it. *See generally* Letter from Computer Science Professors and Computer Scientists (Dkt. No. 23-3). A fear that preliminary research could later be demanded in discovery would inevitably chill the free flow of scholarly communication.

While the students understand that the Court was ruling in a very short timeframe, the students must respectfully note that Court plainly erred by failing apply the *Cusumano* test. If it had applied the test, the MBTA's discovery requests would have failed. The Discovery Order should be rescinded on this basis alone. At a minimum, the MBTA must make the showing required by law.

## B. The Discovery Order Violates the First Amendment Prohibition Against Prior Restraint, Which Includes a Prohibition on Pre-Publication Review.

More broadly, the Discovery Order amounts to a grant of pre-publication review and, as such, flies in the face of long established free speech principles. Such an order would never be permitted if the content in question were, for example, a reporter's notes, and it should not stand here. Through this discovery process, MBTA has enlisted the court's power to obtain pre-publication review of academic speech by a public authority, and delay publication until its review is complete.

Prepublication review has been long been considered deeply offensive to the First Amendment. Indeed, as explained by the Supreme Court in *Alexander v. United States*, 509 U.S. 544 (1993), the doctrine of prior restraint has its roots in this Nation's aversion to the 16th and 17th century English system of censorship that depended on pre-publication review:

> Under that system, all printing presses and printers were licensed by the government, and nothing could lawfully be published without the prior approval of a government or church censor.

*Id.* at 553 n. 2 (citation omitted). The common law prior restraint doctrine expressly rejected such a system as offensive to the First Amendment.

In *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931), the Supreme Court expanded that doctrine to include not only licensing schemes requiring speech to be submitted to an administrative censor for prepublication review, but also injunctions against future speech issued by judges, based in part on a similar aversion to pre-publication review. In that case, the Court held invalid a statute providing for the abatement as a public nuisance of any "malicious, scandalous and defamatory newspaper, magazine or other periodical:

> "[T]he operation and effect of the statute in substance is that public authorities may bring the owner or publisher of a newspaper or periodical before a judge upon a charge of conducting a business of publishing scandalous and defamatory matter and . . . unless the owner or publisher is able . . . to satisfy the judge that the (matter is) true and . . . published with

good motives . . . his newspaper or periodical is suppressed . . . . This is of the essence of censorship."

*Id.* at 713. *See also generally Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389-390 (1973) ("[T]he protection against prior restraint at common law barred only a system of administrative censorship.... [T]he Court boldly stepped beyond this narrow doctrine in *Near* ").

Thus, prepublication review has been permitted only in the most extraordinary circumstances. For example, a contract requiring such review was held constitutional where the defendant, a former Central Intelligence Agency ("CIA") agent, had voluntarily agreed to limit publications regarding CIA activities. *Snepp v. United States*, 444 U.S. 507 (1980). The Court held that the government had "a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service" and the prepublication review requirement was a reasonable means for protecting that interest. *Id.* at 510. Even in these extraordinary cases, there has never been discovery to determine what the CIA agent *knew* (or court review of the agent's knowledge), just a review of what they proposed to publish.

No such extraordinary circumstance exists here. The MBTA already has ample information about its own security systems, what the students know, what they intended to say at DEFCON, and what they would like to be free to say now if the TRO is lifted. (*See* Dkt. Nos. 32, 37.) The MBTA appears to wish to review everything the students have ever done or thought related to their research in order to pass judgment (in the context of the preliminary injunction proceeding) on anything they might say about it in the future.[10] The First Amendment does not countenance that type of pre-publication review, and neither should this Court.

---

[10] MBTA has intimated that it will draw adverse inferences if the Class Paper differs from the confidential report, as if these are not different documents for different purposes

Moreover, the Discovery Order effectively expands the scope of the TRO to require pre-publication review already rejected by Judge Woodlock. In its August 8 Motion for TRO, the MBTA sought an order enjoining the students "from declining to provide the MBTA and its vendors with information sufficient to replicate, test, and repair the purported security flaws in the Fare Media system." *See* Compl. at 17, Requested Relief ¶ 3; *see also* Dkt. No. 9-2 (discussing the Aug 8 hearing) Dkt. No. 9-6 (sending a revised proposed order based on Judge Woodlock's Aug. 8 comments, which included removing the language quoted above) and Dkt. No. 12 (the TRO issued on Aug. 9 without the above language). The duty judge's final TRO excluded that mandate, yet provision of "information sufficient to replicate, test, and repair the purported security flaws in the Fare Media system" is exactly what the MBTA seeks now through its document request. *See* Dkt. No. 28, ¶ 9. This Court should decline MBTA's effort to use the discovery process for the improper purpose of obtaining relief that Judge Woodlock already rejected when granting this controversial TRO.[11] *See generally Dorel Juvenile Group, Inc. v. Summer Infant, Inc.*, 2006 WL 2927321 (D.R.I. 2006) (expressing concern that plaintiff was using dispute as pretext to attempt "to obtain confidential and proprietary information"); *see also generally Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 353 n. 17 (1978) ("In deciding whether a request comes within the discovery rules, the court is not required to blind itself to the purpose for which a party seeks information.").

---

and as if the students' thinking or focus should not evolve over the course of their research.

[11] The better course for the MBTA would have been to seek reconsideration of Judge Woodlock's TRO. While the MBTA did seek to modify the TRO (Dkt. No. 16), it did not challenge Judge Woodlock's refusal to grant this portion of the injunctive relief requested.

## CONCLUSION

For the foregoing reasons, the students respectfully request that this Court reconsider and modify its August 14, 2008 Discovery Order to exclude production of materials described in 2.1 and 5.4.

August 16, 2008   Respectfully submitted,


/s/ *John Reinstein*
John Reinstein, BBO #416120
ACLU of Massachusetts
211 Congress Street, 3rd Floor
Boston, MA  02110
Tel: (617) 482-3170
reinstein@aclum.org

Jennifer Stisa Granick, CA Bar No. 168423
Jennifer@eff.org
Kurt Opsahl, CA Bar No. 191303
kurt@eff.org
Marcia Hofmann, CA Bar No. 250087
marcia@eff.org
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell St.
San Francisco, CA 94110
(415) 436-9333
(415) 436-9993 (fax)

Counsel for Defendants Anderson, Ryan and Chiesa

**CERTIFICATE OF SERVICE**

I certify that this motion and the attached declaration are being filed through the Court's electronic filing system on August 16, 2008, which serves counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF). Any counsel for other parties who are not registered participants are being served by first class mail on the date of electronic filing.

                                                */s/ Marcia Hofmann*
                                                Marcia Hofmann