UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                          )
MASSACHUSETTS BAY         )
TRANSPORTATION AUTHORITY, )
                          )
        Plaintiff,        )
                          )   Civil Action
v.                        )   No. 08-11364-GAO
                          )
ZACK ANDERSON, RJ RYAN,   )
ALESSANDRO CHIESA, MASSACHUSETTS )
INSTITUTE OF TECHNOLOGY,  )
                          )
        Defendants.       )
                          )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


MOTION HEARING



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, August 19, 2008
11 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    APPEARANCES:

 2        HOLLAND & KNIGHT LLP
          By: Ieuan-Gael Mahony, Esq.
 3            Maximillian J. Bodoin, Esq.
          10 St. James Avenue - Suite 12
 4        Boston, Massachusetts  02116

 5        ELECTRONIC FRONTIER FOUNDATION
          By: Cindy Cohn, Esq.
 6            Marcia Hofmann, Esq.
          454 Shotwell Street
 7        San Francisco, California  94110

 8        - and -

 9        AMERICAN CIVIL LIBERTIES UNION
          By: John Reinstein, Esq.
10        211 Congress Street
          Boston, Massachusetts  02110
11
          - and -
12
          FISH & RICHARDSON, PC
13        By: Thomas A. Brown, Esq.
              Lawrence K. Kolodney, Esq.
14            Adam J. Kessel, Esq.
          225 Franklin Street
15        Boston, Massachusetts  02110-2804
          On Behalf of the Defendants Zack Anderson, RJ Ryan
16        and Alessandro Chiesa

17        EDWARDS ANGELL PALMER & DODGE, LLP
          By: Jeffrey Swope, Esq.
18        111 Huntington Avenue
          Boston, Massachusetts  02199
19        On Behalf of the Defendant MIT

20    Also in Attendance:   Scott Darling III, Esq.
                            MBTA Legal Department
21
                            Jaren Wilcoxson, Esq.
22                          Office of the General Counsel of MIT

23

24

25
```

P R O C E E D I N G S

1

2     THE CLERK:  All rise.

3         This is the United States District Court for the

4   District of Massachusetts.  Court is now in session.

5   You may be seated.

6         Calling Civil Action 08-11364, Mass. Bay

7   Transportation Authority versus defendant Zack Anderson,

8   et al.

9         Counsel, please state your names for the record.

10        MR. MAHONY:  Ieuan Mahony from Holland & Knight

11  for the MBTA.

12        MR. BODOIN:  Max Bodoin from Holland & Knight

13  for plaintiff, MBTA.

14        MR. DARLING:  Scott Darling from the MBTA.

15        MS. COHN:  Good morning, your Honor.  Cindy Cohn

16  from the Electronic Frontier Foundation for defendants

17  Anderson, Chiesa and Ryan.

18        MS. HOFMANN:  Marcia Hofmann from the Electronic

19  Frontier Foundation for defendants Anderson, Chiesa and

20  Ryan.

21        MR. REINSTEIN:  John Reinstein, ACLU of

22  Massachusetts, for the individual defendants.

23        MS. COHN:  And, your Honor, co-counsel of the

24  Electronic Frontier Foundation are on the telephone,

25  including Jennifer Granick who could not be here today

1    due to a conflict.

2        MR. SWOPE:  Good morning, your Honor.  Jeffrey

3    Swope, Edwards Angell Palmer & Dodge for MIT.  With me

4    is Jaren Wilcoxson of the general counsel's office of

5    MIT.

6        MR. KOLODNEY:  Good morning, your Honor.

7    Lawrence Kolodney, Fish & Richardson, for the MIT

8    students.

9        MR. BROWN:  Good morning, your Honor, Thomas

10   Brown from Fish & Richardson on behalf of the MIT

11   students.

12       MR. KESSEL:  Adam Kessel, also from

13   Fish & Richardson, on behalf of the MIT students.

14       THE COURT:  Who is going to speak on behalf of

15   the MIT students?

16       MS. COHN:  I am, your Honor.

17       THE COURT:  All right.  Well, there's been a lot

18   of filings in this case recently.  And since I've been

19   on the bench for the last hour and a half or so I don't

20   know whether I've missed anything this morning that has

21   come in late.  I've seen things that were filed last

22   night.

23       Is there anything that has been filed recently

24   that I haven't -- you don't know whether I've seen it or

25   not -- that I might not have seen?

1        MS. COHN:  Your Honor, we haven't filed anything
2    today.
3        THE COURT:  Okay.
4        MR. MAHONY:  Nothing, your Honor.
5        THE COURT:  So the last thing I remember was the
6    memorandum from --
7        MR. MAHONY:  The MBTA.  That's correct.
8        THE COURT:  -- plaintiffs that was filed last
9    night.
10        A VOICE:  Your Honor, may I approach the bench
11    since I will file some evidence this morning?
12        THE COURT:  Who are you?
13        A VOICE:  I'm Dean Chen.  I am just an
14    interested party.  But I will be filing some evidence.
15        THE COURT:  No.  You have no standing here.
16        A VOICE:  Okay.  Thank you.
17        THE COURT:  Well, then if we could refer to
18    yesterday's filings, the most recent, I think, are the
19    papers with respect to the plaintiff's motion for a
20    preliminary injunction which I understand to be
21    essentially a request to continue the temporary
22    restraining order, perhaps with some slight language
23    change, as a preliminary injunction.
24        Let me just address one matter, which I'm not
25    sure has much significance or not, before we proceed to

1  that because I think the way to address the issue is

2  even though there may be other pending matters, is to go

3  directly to that issue.  There seems to be some

4  understanding, I guess is the way to put it, or

5  "thought" may be better, that this being August 19th,

6  which is ten days after the entry of the TRO, that the

7  TRO would expire as of today.  I'm not sure that's the

8  case.

9       Rule 6(a)(2) of the federal rules says that any

10  period less than 11 days excludes weekends, and so on in

11  the computation.  And so under that computation the TRO

12  would continue, of its own force, for the full ten days,

13  I think till Friday.  In other words, it would be -- it

14  was granted on a Saturday, which would be excluded, and

15  the counting would begin on last Monday, that would be

16  five days, and then pick up again yesterday, and it

17  would be another five days.  So I think it would

18  probably expire on Friday.  But I'm not sure that's of

19  any moment; it just may affect the timing of this.

20       But anyway, we have the motion now to convert,

21  or extend, the TRO as a preliminary injunction.  So, Mr.

22  Mahony, if you want to address that motion.

23       MR. MAHONY:  Yes, your Honor.  Thank you, your

24  Honor.

25       Your Honor, I would like to make five points in

the argument in support of this motion. Your Honor, the
discussion -- my points will be driven by the facts
here. As one of the commentaries in the articles the
EFF submitted said, "Talk is talk. Let's see the code.
The goal here is to show the facts to the Court."

Your Honor, the five points are as follows:
First, I'd like to examine, what is the information here
that is at issue? Keep in mind that the MIT students
provided last Wednesday night a 30-page security
analysis of substantially better quality and quantity
than the materials the MBTA had before. With that
security analysis, your Honor, the MBTA, with vendor
assistance, has determined that, in fact, the
CharlieTicket -- not the CharlieCard, but the
CharlieTicket -- system is compromised; that the MIT
students know how to clone and counterfeit
CharlieTickets. So, your Honor, I would like to examine
the information at issue here.

Second: Illegal conduct. Your Honor, illegal
conduct, in fact, took place here. This must inform the
Court's decision-making and all arguments by opposing
counsel here. Your Honor, whatever the end of the MIT
students, whether good or bad, it is unequivocally the
case that they used illegal means toward that end.

Third: I'd like to examine the presentation at

PDF created with pdfFactory trial version www.pdffactory.com

1   issue here.  I'd like to examine the face of the

2   presentation, but also, your Honor, the information

3   behind the presentation:  the software code, the

4   demonstrations that have not been produced in this case

5   despite the Court's instruction to either produce or

6   respond.

7           Your Honor, I will show, I submit, that these

8   materials, from what we can glean, even though they've

9   been withheld presentation materials, are not -- they

10  are not abstract theoretical advocacy but rather

11  specific instructions and demonstrations on the methods

12  for committing crimes under the CFAA.  Your Honor, these

13  are words likely to incite lawless action, and that's a

14  quote from the North American Man/Boy Love case from

15  this very Court.

16          Four:  I'd like to address the balancing of

17  harms and what is responsible -- what is responsible --

18  disclosure in this case under these circumstances.  Were

19  these MIT students responsible?  Are they being

20  responsible now in withholding information about

21  security vulnerabilities potentially at the T?

22          And then finally, your Honor, I'd like to talk

23  briefly about the public interest.  This is policy

24  issues concerning security through secrecy, security

25  through open disclosure.  And I propose, your Honor,

1    that these broad issues -- these broad policy points --

2    do not conflict in these circumstances.

3          The MBTA, with vendor assistance -- and again,

4    based on the security analysis that the students

5    provided last Wednesday -- has concluded that a

6    five-month period of time is needed to mitigate and

7    remedy the threats that the information poses and what

8    the students have discovered.  Your Honor, it's a

9    five-month period of time.  There is good public

10   interest in following through with that.

11         Now, let me turn, then, to the particular

12   points, your Honor.  The information at issue:  I'd like

13   to call the Court's attention to Docket No. 56, Exhibit

14   1, which is the third supplemental declaration that I

15   presented, your Honor, last night.

16         The Court has it?

17         THE COURT:  No.

18         MR. MAHONY:  Do we have some copies?

19         THE COURT:  Well, actually, I can get it.

20         Gina, can you pull it up?

21         I'll turn to my assistant to do it.

22         MR. MAHONY:  Your Honor, if I could just bring

23   this up.

24         MS. COHN:  Counsel, do you have a copy for me?

25         MR. MAHONY:  It's in the exhibit book; you have

1  it.

2          MS. COHN:  What book?

3          MR. MAHONY:  The courtesy copy.  What do you

4  have right there?  Yes, it's 56.

5          So, your Honor, the docketed copy is at 56.

6          THE COURT:  Fifty-six, Exhibit 1.

7          MR. MAHONY:  And it's Exhibit 1, and it's a

8  document Bates-stamped at the bottom MBTA0001.  And I'll

9  just call the Court's attention to the very top of that

10 page.  It's an e-mail from Zack Anderson to DefCon, and

11 it states, "Attached is my submission for a talk at

12 DefCon 16 this year."  And that's dated May 15, 2008.

13         Now, your Honor, if we look at the submission

14 itself, you can see that -- the title of the

15 presentation on the first page, "Anatomy of the Subway

16 Hack," and then if we take a look at the second page of

17 the document, it's MBTA0002, under "Presentation

18 Information" -- and again, your Honor, we're talking

19 about what is the information at issue; what are we

20 concerned about?  This is the submission that goes to

21 DefCon that says the full presentation, and I'll point

22 that out to the Court.

23         Up at the top it says "Presentation

24 Information."  And then if the Court looks down three or

25 four lines it says "Is there a demonstration?"  And the

PDF created with pdfFactory trial version www.pdffactory.com

1    answer is "Several."  If we look at the next line:  "Are

2    we releasing a new tool?"  So that's a new software

3    tool.  The answer is "Yes."

4         Now, if the Court takes a look a little further

5    down the page it says "Detailed Outline."  And if the

6    Court looks at Item III(B) which says "MIFARE RFID card

7    attacks," under that in item one, line one, it says

8    "Code Release."  If we look at Item 2 it says "Possible

9    demo and code release (possible because as of today the

10   Verilog is not finished)."

11        If we look on the next page, so page 3 of this

12   document, Item 4 says "Algebraic attacks."  It says

13   "Code Release."  Your Honor, this code is what the

14   Court -- is what we ask the Court to ask the

15   plaintiff -- I mean, I'm sorry, the defendants -- to

16   produce.

17        Four:  "Algebraic code release."  Item C refers

18   to cloning and forgery attacks on the CharlieTicket.

19   Item 1 refers to automated magstrip reverse-engineering

20   tool release.  Item 2 says "Python script release and

21   demo."  So there are a number of various software code

22   releases and other tool releases that are referenced in

23   this submission.

24        And also, your Honor, I'll note that when the

25   code was not completed, when Mr. Anderson had code that

1  wasn't done, he informed DefCon, "Oh, the code isn't

2  ready yet," as in Item 2 about the Verilog isn't

3  finished.  The reason the MIT students have said they're

4  unwilling -- or they refuse -- to produce the software

5  code that -- in connection with this presentation is,

6  they say, "Oh, it wasn't ready yet."

7        Now, your Honor, I also point out reference to a

8  white paper on page 4.  Up at the very top of page 4 it

9  says "Sample slides about this talk."  And then if the

10  Court looks to the next paragraph it says "White paper

11  about the material in the talk," and that is a web

12  address.  And we believe, your Honor, that that's the

13  class paper that the students have also refused to

14  produce.  There's no password referenced in connection

15  with this.  That appears to be openly available to

16  anyone on the Internet.  And, again, they refuse to

17  produce that paper.

18        Now, your Honor, if the Court were to take a

19  look at the page -- further down this page it says

20  "Legal Stuff," and then it says "Copyright Use Grant."

21  And in that last paragraph down there it says "If I am

22  selected for presentation, I hereby give DefCon

23  Communications, Inc., permission to duplicate, record

24  and distribute this presentation including, but not

25  limited to, the conference proceedings, conference CD,

video, audio, handouts to the conference attendees for
educational, online, and all other purposes."

This is an unlimited grant; this is not a grant
for educational purposes only.  But for non-commercial
*[sic]* purposes this is an ultimate grant device to
DefCon as well as the attendees.

Now, your Honor, let me call the Court's
attention to the next section which says -- on this same
page, page 5, which says "Terms of Speaking
Requirements."  Your Honor, this is a contract.  And
Mr. Anderson, on behalf of MIT students, agreed in
Paragraph 1 -- he said, "I will submit a completed and
possibly updated presentation, a copy of the tools
and/or codes, and a reference to all of the tools, laws,
websites and/or publications referenced to at the end of
my talk and as described in this CFP submission for
publication."

So, your Honor, all of the materials that I read
to the Court -- the code, the demonstration, all of
those tools -- Mr. Anderson agreed to submit to DefCon,
and signed this contract to do so.

Now, your Honor, where is -- where is this
information?  Your Honor, during the hearing before
Judge Woodlock, EFF counsel stated that all of the
information that was relevant -- all of the

1  information -- was just inside this presentation;

2  nothing outside the presentation, nothing outside the

3  four corners.  And the Court asked three times -- the

4  Court said, "Just a moment."  And this is from page 11

5  of our brief that gives the precise pinpoint cites of

6  that transcript, your Honor.  And this is with EFF

7  counsel.

8      "THE COURT:  Just a moment.  Is there anything

9  of substance to the presentation, anticipated for the

10 presentation that is not on the slides?

11     "ANSWER:  No, your Honor."

12     The Court again:  "All right.  These are the

13 entire materials that you intend for presentation?"

14     "MS. GRANICK:  Those are the visual materials.

15     "THE COURT:  Well, is there anything else that

16 is of substance for the presentation?

17     "MS. GRANICK:  No, your Honor.

18     "THE COURT:  There will be nothing beyond what's

19 shown on these several slides?

20     "MS. GRANICK:  No, your Honor."

21     Your Honor, that's inaccurate.  Later on after

22 the Court's pressing, Ms. Granick admitted, "Oh, yes,

23 there are," and counsel is pointing out the reference to

24 the software tools.  Oh, there are software tools.

25     The Court asked:  "What are these tools?"  And

1    the response was, well, these tools, they're tools that

2    allow you to carry out these attacks, but they're not

3    malicious.

4         How are we to judge that, your Honor?  We don't

5    have the tools, and we're to take the word of counsel

6    because the tools have been withheld.

7         Now, your Honor, the Court asked at that

8    hearing:  "Demonstrations.  What are these?  What do the

9    demonstrations do?"  And the response was -- and again,

10   this is on page 12 of our brief -- the response was,

11   "The demonstrations by the MIT students at the DefCon

12   conference will be designed to show how to create a

13   forged card; in other words, one that is not issued by

14   the MBTA."

15        Now, your Honor, the students have asserted

16   their First Amendment right to withhold demonstration

17   materials and to withhold these software tools.  We've

18   seen, your Honor, that the key information that has been

19   produced so far -- which is compiled in that 30-page

20   document under seal, which I believe is Docket 32 -- the

21   key information here, your Honor, is real; this is not a

22   prank.  They've compromised the CharlieTicket, your

23   Honor.

24        So the information has value; it's of concern;

25   it has a real threat.  And there is additional

information that was designed for this conference that

they contractually agreed to present at this conference

that they refuse to withhold *[sic]* on First Amendment

grounds.

This is the second point:  Your Honor, I would

like to call the Court's attention to the presentation.

And if I may just approach the bench?  What we have here

are just a compilation of exhibits.  We've given these

to opposing counsel.  But the only exhibit -- this was

done for last Thursday's meeting.  But the only exhibit

that is really of value for the present purpose is

Exhibit 17.  And Exhibit 17, your Honor, which looks

like this, is the same as Docket No. 9-7.  So Exhibit 7

in Docket 9.  The difference, though, your Honor, is

that we've put Bates numbers at the bottom of the pages

to make it easier to refer to the specific pages.

Now, your Honor, if I could call the Court's

attention to Bates No. 140 in the presentation which

looks like this.  And, your Honor, our surmise from this

document is that it is a way, visually, to indicate how

to take a dollar twenty-five CharlieTicket and turn it

into a $100 CharlieTicket so it's counterfeit.

What T officials did, your Honor, is in this

second $100 ticket, there's a serial number.  Now, T

personnel took that serial number, linked the image of

1  that CharlieTicket and that serial number to serial

2  numbers of multiple additional CharlieCards. These are

3  all clones of each other. The officials constructed an

4  auto trail showing payments, use and other activities.

5       The linked tickets, they all were used

6  illegally. Again, your Honor, whatever the end the MIT

7  students might have had in mind, or have in mind, it's

8  unequivocal in this case that they used illegal means.

9       And let's examine what MIT student -- the MIT

10 students and counsel say about this. Mr. Anderson says

11 in the press, and now, just as of last night in a

12 declaration, "We never rode the T for free," so it must

13 be okay. Counsel -- EFF counsel says -- and this,

14 again, is in our brief at page 13. We give the cite to

15 the transcript from the original hearing. Counsel

16 claims that the research the MIT students compiled was

17 not obtained through any kind of unauthorized access to

18 computers.

19       Now, your Honor, not riding the T for free is

20 very different than claiming no unauthorized access to

21 computers. So we have the clients saying one thing and

22 we have their counsel saying another. Which is it?

23       Your Honor, this is misinformation that the

24 requested deposition was designed to prevent. And I'd

25 note, your Honor, that while counsel said to this Court

PDF created with pdfFactory trial version www.pdffactory.com

1   on Thursday Mr. Anderson is on holiday and he is too

2   busy to appear for a four-hour telephone deposition,

3   Mr. Anderson has been giving press statements, I

4   understand he was on WBZ radio this morning, and he's

5   had time to put together declarations.  Your Honor, the

6   Court asked for a good, factual record before to make

7   this decision.

8            Now, your Honor, let me turn to my third point,

9   which is the presentation itself.  And, again, that's

10  the material in Tab 17 in the handout that I just

11  provided the Court.

12           Your Honor, this document, plus what we believe

13  is the underlying software code and demonstration

14  materials, are not abstract theoretical advocacy, but

15  instead, they're specific instructions for violating the

16  CFAA.

17           If the Court were to take a look at page 105,

18  which is the first page, down at the bottom of that page

19  the Court can see it says "For updated slides and code"

20  see this website.  That's the code we ask for, your

21  Honor.  If the Court could take a look at page 107, the

22  slide says "What this talk is not:  Evidence in court,

23  (hopefully)."  It shows an anticipation and realization

24  that this talk was problematic.

25           Let me look at -- call your attention to the

next page, which is 108.  The slide says "You'll learn
how to..."  Your Honor, this is instructional text.
"You'll learn how to generate stored-value fare
cards" -- those are counterfeits -- "reverse engineer
magstrips"; "hack RFID cards"; "use software radio to
sniff" -- that is to obtain information from computer
systems; "use FPGAs" -- so field-programmable gate
arrays -- "to brute force"; "tap into the fare vending
network"; "social engineer"; and "Warcart."  So this is
instructional text.

          Now, your Honor, if the Court would take a look
at the next page which states, "And this is very
illegal!"  And, your Honor, just as a note, at the
bottom it says "So the following material is for
educational use only."  Well, we've seen in the contract
that the MIT students have granted unlimited rights of
their material.  And if the Court could take a look at
page 129.  After working through a variety of methods on
cloning and counterfeiting cards the text says "You now
have free subway rides for life."  It doesn't say "you
will have" or "you may have" or "if you follow these
instructions," et cetera, it says "You now have free
subway rides for life."

          If I could call the Court's attention to page
142, this is a page that is showing a demonstration to

1   the MagCard reverse engineering toolkit.  And it refers

2   to Python libraries -- again, these are software

3   libraries, an open source for analyzing MagCards.  And

4   at the bottom it says "Can now forge cards."

5        And then lastly, your Honor, I'd like to call

6   the Court's attention to page 176.  And, your Honor,

7   this is a photo of network switches in the T's network

8   system.  These are sensitive devices, and in order to

9   get here there would need to be some trespass committed.

10   But that's not the point right now.  The point is that:

11   Take a look at -- these are network switches.  All the

12   data is running through these network switches.  It's

13   not just the CharlieCard and the CharlieTicket; it's all

14   ACF data are running through these switches.

15        And then if the Court could take a look at the

16   next page, you would see it's the same photo, but at the

17   bottom there's the addition of a blue rectangle that

18   says "Wireshark."  Wireshark is sniffer technology that

19   allows one to sniff -- in other words, monitor, surveil,

20   intercept -- information over a computer network.

21        Your Honor, these are words -- and again, we

22   don't have the full presentation because they refuse to

23   give it, but these are words likely to incite imminent

24   lawless behavior.  This is the DefCon conference.  As

25   commentators have stated, there are the white hats at

1  the conference who are out for the greater good, there
2  are the grey hats who are in between, and then there are
3  the black hats who are out to cause problems.

4      We have submitted an affidavit that has a
5  collection of articles about the DefCon conference to
6  give the Court a flavor of the type of audience that
7  this is being presented to.

8      Like the *Rice* case, which is the case about the
9  book called "Hit Man" -- and the book essentially
10 teaches you how to rough people up and kill them.  But
11 it doesn't do it in an abstract, theoretical matter; it
12 has pictures, it has tools, it has everything -- your
13 Honor, these are instructions and step-by-step
14 directions on how to engage in conduct prohibited by the
15 CFAA; this is not protected speech.

16     Let me point now to balancing of the harms in
17 responsible disclosure.  Your Honor, the MBTA does not
18 claim that the doctrine, or the principle or the concept
19 or whatever you might want to call it, of responsible
20 disclosure is written in the law.  The Court on the
21 injunction motion is acting equity.  Your Honor,
22 responsible disclosure should inform this Court, we
23 believe, deeply in terms of the equities.  What is fair
24 between the parties here?  What is responsible?

25     Your Honor, the students posted their

1    presentation online -- this document we were just going

2    through, posted it online -- starting June 30.  It was

3    available unpassword-protected.  There was no meeting

4    with the T until August 4.  At that meeting the MIT

5    students and Mr. Anderson told law enforcement that

6    nothing illegal went on.  We've seen that's incorrect;

7    that was untrue.

8            They did not provide the presentation at that

9    time.  After that there were numerous contacts between

10   MBTA officials and Professor Rivest who was acting, we

11   view, at least with apparent authority as their agent in

12   setting up the meetings and scheduling the

13   communications with the T.  And finally, your Honor, on

14   Friday, the 8th, they agreed to give the presentation,

15   but then at roughly 6:45 EFF counsel instructed them not

16   to give the presentation to the T, even though the

17   presentation had been publicly available at the

18   conference as of Thursday.  So we have a document that's

19   available publicly that counsel is instructing clients

20   not to provide, and I'm not sure why.  And, your Honor,

21   that was their responsible disclosure.

22           Now, I want to temper that statement, your

23   Honor, with a clear statement that the security analysis

24   that the students provided to us last Wednesday, that is

25   a very useful document.  As I said, from that document

     1   we came to the conclusion that the ticket has been

     2   compromised.  They're able to compromise the ticket.

     3   So, your Honor, when I talk about responsible

     4   disclosure, there are spots of great sunlight and then

     5   there are spots of great darkness.  So I don't want to

     6   be too argumentative in talking about this as

     7   unequivocal non-irresponsible disclosure.  But, your

     8   Honor, in terms of prior to that security analysis, yes.

     9          And now, your Honor, the security analysis is

    10   wonderful, but there are additional materials that cause

    11   us great concern.  Is this responsible disclosure now:

    12   withholding the class paper, withholding the software

    13   code, withholding the demonstration materials?

    14          Balancing the harms, your Honor?  We ask for a

    15   five-month injunction.  We've tailored the injunction so

    16   it only covers nonpublic materials.  We believe that

    17   will preserve the status quo.  Our hope, your Honor, is

    18   that the parties will continue to talk in a constructive

    19   manner along the lines of the security analysis to

    20   resolve these issues, and at the end of that five-month

    21   period they're free to discuss whatever they need to

    22   discuss or whatever they feel like discussing.

    23          Finally, your Honor, the last:  the public

    24   interest.  On the one hand, your Honor, the MIT students

    25   claim an unfettered right to disclose.  Despite illegal

1   conduct, despite incitement to others to copycat, they

2   say:  We should be able to disclose.  On the other hand,

3   your Honor, they claim essentially an unfettered right

4   to withhold.  We're not disclosing the class paper,

5   we're not disclosing the demonstration papers, et

6   cetera.

7           In this vein, your Honor, I would like to point

8   briefly to the letter from the professors -- the 11

9   professors -- that was submitted to this Court.  And I

10  think that letter is useful, one, in terms of

11  demonstrating that the MBTA's position and the

12  professors' position is not that different; and, two,

13  demonstrating that the professors are addressing a

14  question that does not bear on the facts here.

15          Your Honor, the professors state that they have

16  a firm belief that research and security vulnerabilities

17  and sensible publication of the results of the research

18  are critical for scientific advancement.  That's on page

19  1 in the brief, your Honor.  Your Honor, that term

20  "sensible publication" we agree with strongly.

21          The professors also state, "Generally speaking,

22  the norm in our field is that researchers take

23  reasonable steps to protect the individuals using the

24  systems studied."  We agree as well, your Honor.  Your

25  Honor, where we diverge is the professors say that using

1  the law to silence researchers is improper.

2       Your Honor, we're not asking to silence these

3  researchers at all; we're asking for a time-limited

4  injunction with respect to nonpublic information that we

5  now know, based on further disclosures, is threatened

6  and poses a real threat to the system.

7       Your Honor, as the professors state on page 4,

8  "It is much better from everyone's perspective if

9  researchers discover the break and publish it than if

10  unscrupulous discoverers of the break exploit it without

11  public notice."  Your Honor, we can agree with that

12  position, but we think better than that position is the

13  responsible disclosure doctrine from industry, not from

14  academia, that we propose, which is researcher finds the

15  flaw, brings it to the target, there's a resolution, and

16  then there's publication.  That prevents the harm to the

17  target and serves the public interest in providing full

18  disclosure of the issue.

19       Now, your Honor, finally, the professors ask

20  that vendors should not be given complete control over

21  the publication of information as it appears that the

22  MBTA sought here.  Your Honor, again, with the relief

23  that we requested, we have not sought complete control

24  over what the students are saying and the point is

25  inaccurate.

 1          Your Honor, a final point on the professors'
 2   formulation:  The professors' formulation did not
 3   address the situation where the researcher has used
 4   illegal means to capture the valuable research.  Your
 5   Honor, in that position Mr. Bodoin has hacked into my
 6   system and he has committed illegal acts -- but he
 7   hasn't hurt anyone -- to get that information.  Now,
 8   your Honor, from an interperspective, I want that
 9   information so that I can fix my system.
10          Now, who owns the information, whether I should
11   be able to exploit it for someone else or whether
12   Mr. Bodoin should be able to, you know, reap the
13   commercial benefit of that, that's another issue.  But,
14   your Honor, I am going to want that value to know where
15   my flaws are.  Mr. Bodoin, however, if he's used illegal
16   activity to get into that system to discover this
17   valuable flaw, is going to be concerned that I'm going
18   to say to him, "Mr. Bodoin:  CFAA.  You'd better watch
19   out.  You've got criminal exposure," or civil exposure.
20          The solution to that problem, your Honor, in
21   other words, in order to get the plum, the prize, the
22   value:  I need to commit an illegal act.  I need to hack
23   into someone's system.  And the solution the professors
24   propose is:  Narrow the CFAA.  Don't make that
25   conduct -- or talking about that conduct -- don't make

1  that illegal.  So, in other words, if I've committed

2  illegal acts like the students here, and I get that

3  plum, that value, and I talk about it to the world at

4  large, that should not be a violation of the CFAA.

5        Your Honor, it proves too much.  Narrowing the

6  CFAA, as is proposed here -- in other words, by reading

7  this term "transmission" to exclude written

8  transmissions like the presentation, code transmissions

9  like the code, verbal transmissions like the verbal

10 presentation -- to narrow the CFAA in that manner will

11 exclude -- sure, it will protect the good guys, but it

12 will exclude a vast range of potential bad guys.

13       If this were a terrorist conference and

14 terrorists were saying:  This is the way -- you have

15 code here to hack the federal court system, or to

16 disrupt the financial institutions, it would be a much

17 easier issue.  But it's still the same, your Honor.  The

18 solution should not be to narrow the CFAA; the solution

19 should be to rely on established First Amendment

20 jurisprudence which prohibits words likely to incite

21 imminent unlawful activity and read the CFAA the way

22 it's intended to be written, which it picks up

23 transmissions of information.

24       Now, in sum, your Honor, these broad issues of

25 the public interest we think strongly support the

1   requested relief here.  It's time-limited relief.  It
2   allows the parties to talk, solve the problem, and it
3   leaves the students free to publish research results and
4   continue on or have presentations as they see fit.

5           Thank you, your Honor.

6           THE COURT:  Ms. Cohn?

7           MS. COHN:  Good morning, your Honor.

8           I want to first clarify a couple of factual
9   things that I think have become clear as a result of the
10  preliminary injunction papers that were filed late last
11  night.  And I do want to apologize in advance:  I'm
12  ready to argue the preliminary injunction today but I
13  will note they were filed while I was on an airplane and
14  I had the two hours after my red eye landed today to
15  prepare.  So I apologize if I'm not as polished as I
16  might be this morning.

17          THE COURT:  They are quite similar to the other
18  filings, I noted.

19          MS. COHN:  So the first thing is that the MBTA
20  has now been really clear that there was not a
21  compromise of the CharlieCard in the students'
22  presentation; there was a compromise of the
23  CharlieTicket.  So any of the information or allegations
24  or anything about the CharlieCard are simply irrelevant
25  for purposes of the preliminary injunction because the

1    students were not able to expose a vulnerability in that
2    card.  They came up with theoretical information about
3    possible vulnerabilities but they were not able to
4    demonstrate one.  So I think that the CharlieCard issue
5    should be off the table for purposes of the preliminary
6    injunction because the only information that could cause
7    harm to the MBTA, even under their own analysis, is the
8    information about the CharlieTicket.
9        So now moving to the actual merits of the
10   preliminary injunction hearing, I think that the
11   Court -- you know, the preliminary injunction standard
12   is the likely success on the merits, irreparable harm
13   and the balancing.  I don't think your Honor needs to
14   reach the second two because there is no Computer Fraud
15   and Abuse Act claim here.  There simply is not.  And
16   that is the sole basis on which they have asked for this
17   injunction.
18       The Computer Fraud and Abuse Act is a statute
19   that is expressly and intentionally aimed at attackers
20   to computers.  It's aimed at viruses and worms and
21   damage that can happen to computers.  And it is
22   expressly limited to transmission of information to a
23   computer under 1030(a)(5)(A)(i).
24       This is clear and consistent throughout the case
25   law applying this statute.  In fact, Judge Posner in the

1    *International Airport Center* case expressly talked about

2    how you can't read "transmit" too broadly because if you

3    did, you know, hitting the delete key would be transmit,

4    and Congress didn't intend for it to reach that.  So

5    while counsel cites the Webster dictionary definition

6    which includes both the definition that we think is

7    appropriate here, which is definition seven about

8    "transmission" meaning transmission to a device or a

9    computer, that's not really what Congress was talking

10   about here.

11          And it's very clear from the legislative history

12   and it's consistent throughout the case law.  And they

13   can cite not a single case that supports the definition

14   of "transmission" as computer -- as communications to

15   people as opposed to communication to computers.

16          And you can see that even in the text of the

17   statute itself.  1030(a) is the provision involving

18   national security computers:  computers that are owned

19   by the Justice Department, that are actually part of

20   Homeland Security.  There Congress said communication of

21   information could be a violation of the Computer Fraud

22   and Abuse Act.

23          But in the provision of the statute that we're

24   talking about here, which is at (a)(5)(A)(i) which

25   involves the rest of the computers in the world, the

1  ones that aren't involved in national security, which is

2  what we're talking about here with the transit

3  computers, communication is not included in the

4  definition.  And I think that's intentional.  I think in

5  the context of the national security situation and an

6  attack on a national security computer, I think the

7  First Amendment -- there's at least an argument there

8  that the First Amendment might countenance criminalizing

9  the communication.

10         But in the context of every computer that is

11 possibly connected to the Internet, which is what the

12 rest of the CFAA reaches, the definition of "protected

13 computer" under that law, there is no use of the word

14 "communication"; there's only use of the word

15 "transmit."

16         So if you look at the legislative history, if

17 you look at the statute itself, and if you look at

18 the -- all of the case law on the Computer Fraud and

19 Abuse Act, it's clear that "transmission" under the

20 statute means transmission to a computer, not speech to

21 a person.

22         There's also a second -- there are two other

23 problems with the Computer Fraud and Abuse Act claim

24 here that we haven't had a chance to develop more fully

25 but I think are fairly obvious from what we have so far.

First, entirely -- it doesn't allege the $5,000
jurisdictional minimum for a Computer Fraud and Abuse
Act claim has been met here.  That's because a computer
must be damaged in an amount; it must be actually
damaged by an attack.  Again, we're thinking about
viruses and worms and other sorts of direct attacks on
computers.

And there's no allegation of any damage to any
computer through anything that the student did or the
presentation.  The damage is, to the extent that there
is one, that the MBTA might not make as much money as it
might otherwise make.  There's no allegation of damage
to any computer.  And there's certainly no allegation of
loss in excess of $5,000 here.  It's purely speculative.

Their argument turns on the idea that somebody
who hears this general information might turn around and
do something, and that something may cause damage and
that damage might be over $5,000.  That is not
sufficient for a CFAA claim, and it's certainly not
sufficient for an injunction under the CFAA at this
particular point.

Secondly, it does appear to be unclear whether
this is actually -- the MBTA's claims actually affect
interstate commerce.  It is not at all clear that there
are fare devices in Rhode Island.  My understanding from

my local counsel is that the fare devices are all in
Massachusetts.  And I think there is a threshold-level
question about whether these are protected computers
under the CFAA that is worthy of further consideration.

So the CFAA just doesn't apply here.  And
there's a good reason why it shouldn't apply here, why
it shouldn't be expanded in the way that plaintiffs
would like you to expand it.  And that, of course, is
the First Amendment.  If the CFAA was read to reach
speech, truthful speech, on a matter of public
importance, then the statute would be in tension with
the First Amendment.  And of course your Honor is well
familiar with the idea that you should not read a
statute to create constitutional problems and that you
should avoid reading statutes in such a way, and yet the
MBTA urges on you an interpretation of the CFAA that --
again, supported by no case law, no legislative history
and no significant analysis, and would put the statute
in tension with the First Amendment.  And I think you
should not consider going in that direction.

Now, in the preliminary injunction papers the
MBTA -- and in the oral presentation that counsel just
made MBTA makes -- brings in new information.  We made
these arguments about transmission.  And the parties
have gone back and forth on them.  There's one new piece

1    of information that's MBTA brings to this -- in the

2    preliminary injunction papers.  And this is their

3    conclusory allegation that there may have been some

4    illegal activities by defendants in doing their

5    research.

6        Now, but that conclusory allegation -- first of

7    all, it's unsupported; they don't say what it is the

8    clients -- what it is that the students did, where they

9    did it, how they did it.  They just assert that now it's

10   incontrovertible.  Well, we would like to see that

11   evidence.  Certainly their conclusory assertion

12   shouldn't be the basis upon which this Court makes a

13   finding.

14       But in any event, even if it is true that they

15   may have a small claims action for something against --

16   the clients did, or there was some minor infraction

17   along the way to doing their research, that is not a

18   Computer Fraud and Abuse Act claim.  It doesn't meet the

19   jurisdictional minimum, it doesn't appear that there was

20   any transmission -- illegal transmission in this

21   particular incident, and it's simply below the statutory

22   threshold for the Computer Fraud and Abuse Act.

23       So the fact now that they have made a new

24   allegation that there may have been some illegal

25   activity by the students, which we hotly dispute,

1    doesn't provide them a Computer Fraud and Abuse Act

2    claim in this case.  So if they don't have it for the

3    speech and they don't have it for what the students may

4    have done in creating the speech, then they don't have a

5    Computer Fraud and Abuse Act claim and they do not have

6    a likelihood of success on the merits.

7         Even if you were to find that there was a

8    colorable Computer Fraud and Abuse Act claim, the law

9    would not countenance a prior restraint in these

10    instances.  Remember that the prior restraint doctrine

11    is one of the strongest doctrines in constitutional law;

12    it protects truthful scientific speech, it protects

13    speech that was gained illegally, and it protects speech

14    when the publication of that speech would be illegal.

15         And we need look no further than the *Pentagon*

16    *Papers* case decided by the U.S. Supreme Court.  When

17    Daniel Ellsberg took the Pentagon Papers out of the

18    Defense Department, he violated federal law clear and

19    unequivocally.  And when he sought to publish that

20    information which was classified, that publication

21    violated public law.  The Supreme Court said a prior

22    restraint shall not issue for this publication and the

23    information -- and the lower court's prior restraint was

24    overturned.

25         Now, in that instance we have both of the things

that Mr. Mahony claims that my clients did here.  They

claim that they got the information illegally, or that

they broke some law along the way, and they claim that

presenting this information to the public, while not

itself illegal -- it's one step further removed from the

*Pentagon Papers* case -- might incite other people to

lawless behavior.

Well, if that was the law, the *Pentagon Papers*

case would have gone the other way.  And that's still

the controlling Supreme Court authority here.  That's

because the First Amendment and the prior restraint

doctrine countenance strongly against prior restraints

on speech.  There may be subsequent punishment after

speech.  And indeed, all of the cases that they cite in

their argument that there's imminent lawless action and

aiding and abetting are not prior restraint cases; they

are all 201 subsequent punishment cases.  The *Paladin*

*Press* case is a subsequent punishment, the *Rice* case

that we talked about earlier; *NAMBLA* -- the *NAMBLA*

case -- the *Curley* case is a subsequent punishment case;

the *Brandenburg* case is a subsequent punishment case;

the *Knapp* case is a subsequent punishment case.

All of the cases that they are using to support

their legal theory that a prior restraint is legal here

are not prior restraint cases.  And there's a very good

PDF created with pdfFactory trial version www.pdffactory.com

reason why they're not: because there aren't any prior restraint cases that would countenance what they're trying to do to the clients here. The clients are engaged in academic research, the information they want to publish is truthful and it's important to the public debate. This -- if you issue this preliminary injunction here you will be setting -- you will be making an unprecedented ruling, and I think that it's the wrong course to go on. I think that we've had a prior restraint too far -- so far here for far too long.

The second -- the next thing I want to talk about is the issue of irreparable harm. Now, they have not met their burden to show that they will suffer irreparable harm here, especially in the specific context of this situation. While they like to say that the students want to be free to say everything, the students have never wanted to say everything. They have always wanted to withhold what they call key information, information that would allow someone to replicate the attacks from what they speak about.

But let's be clear. There are three categories of speech here that we're talking about -- and by the way, they even went above and beyond, I think, what they needed to do here and they wrote a paper called "A Security Analysis" that we submitted to you under seal

1   and gave to them last week to try to capture the

2   universe of what they want to say publicly.

3           They have been very clear, they have been very

4   consistent, and they have told anybody who wants to

5   listen that they never intended to give information

6   necessary to replicate the attack.  And, in fact, they

7   didn't.  They have never given the information necessary

8   to replicate the attack.  And to the extent that anyone

9   in this courtroom gave information that was necessary to

10  replicate the attack on the CharlieTicket, it was the

11  plaintiffs, because they published the first

12  confidential report that the defendants wrote for them

13  even before the presentation on the court docket.  And

14  that included the information that the clients -- that

15  the MIT students did not intend and were not going to

16  present at the DefCon conference.  So to the extent that

17  anyone's been a little laissez-faire here about making

18  sure that nobody can replicate the vulnerabilities that

19  our clients found, I think you have to look at the MBTA.

20          But in any event, they have not met their burden

21  of proving irreparable harm here because the students

22  don't want to give that key information.  As I said,

23  there are three pieces of information or three

24  categories of information:  There's the public

25  information.  Everybody agrees that that's outside the

1   case -- outside the scope of the injunction.  There is

2   the key information, the crown jewel that you would need

3   to replicate this attack.  The clients do not want to

4   publish this, they never indicated they want to publish

5   it, and they certainly don't want to publish it now.

6           Then there is the universe of nonpublic

7   materials that is important to understanding what the

8   students did, without allowing replication, but to give

9   context and background to what -- to what it is the

10  students are saying.  Remember, it was not until just

11  this morning that the MBTA admitted that what the

12  students did wasn't a prank.  Until we pushed this to

13  this Court, they were trying to deny that this happened

14  and punish the whistle-blowers.

15          You know, if there's ever been a

16  shoot-the-messenger case, I guess this is it.  Our

17  clients didn't create a vulnerability in the MBTA fare

18  security system; they just discovered one.  The

19  vulnerability was there.  Other people would have found

20  it, or may have found it already, but the -- you know,

21  to the extent, you know, that they are being punished

22  here, they're being punished because they want to speak

23  about a truthful thing that they discovered.

24          So the MBTA has not met their burden that there

25  will be irreparable harm here if the students are

1    allowed to talk about not the key -- crown jewels,

2    because they don't want to talk about that, but the

3    second category of nonpublic information that is

4    contained in the security analysis.

5         Now, we gave this to your Honor very explicitly

6    because we wanted you to take a look at that security

7    analysis, and we felt that if you did, you would agree

8    with this:  that there's nothing in that security

9    analysis but speech.  It's pure protected speech.  It's

10   research materials and it's the result of the research,

11   and that's all that's in there.

12        So we have given them the universe of what the

13   clients want to say.  And effectively I think what the

14   MBTA is saying here today is:  Well, we want an

15   injunction because we're scared that they might say

16   something else.  But the First Amendment is very clear

17   on this:  You don't get an injunction against speech

18   based on a speculative fear; you don't get an injunction

19   on speech based on the fact that, well, you don't want

20   to say it anyway so let's just enjoin you from saying

21   it.  Those are the things that are off the table in the

22   context of prior restraints on speech.

23        And it does appear that that's kind of what they

24   want here.  They want to enjoin the clients from not --

25   from saying things that the clients don't want to say,

1   and they want to enjoin the clients because they're

2   afraid that the clients might say something else other

3   than what the clients have very consistently, both

4   privately and publicly, told the MBTA they want to say.

5           So finally, the balancing, the third prong of

6   the preliminary injunction test:  Again, MBTA has not

7   met its burden -- its very high burden -- to counteract

8   the public interest in the free flow of information

9   here.  The status quo under the First Amendment is the

10  free flow of information.  And the computer science

11  professors and computer scientists agree that the free

12  flow of science could be chilled here.

13          If your Honor issues an injunction preventing

14  the students from presenting their research, you're

15  going to have a ripple effect across the computer

16  research community.  You're going to have people afraid

17  to do research; you're going to have people afraid to

18  talk about their research; you're going to have people

19  afraid to engage in peer review of their research,

20  which, by the way, is what the DefCon conference is

21  about, it's about peer review of scientific research by

22  researchers; and they -- you're going to set an example

23  that's going to cause ultimately all of us to be less

24  secure.  Because what security researchers do, while it

25  may not be popular with vendors and transit authorities,

PDF created with pdfFactory trial version www.pdffactory.com

1  ought to be popular for all the rest of us, because it's

2  what keeps us safe from the hackers, from the worms,

3  from the viruses, from the evil people.  And I guess

4  it's what keeps the MBTA safe from people who want to

5  not pay for transit fees.

6          Ultimately -- this is the main point made by the

7  11 eminent computer security researchers, and I believe

8  that given more time I could have easily gotten triple

9  this number to sign -- is that the dialogue that happens

10 in computer security research is important to the public

11 interest.  It's exactly why the First Amendment protects

12 research and scientific speech to the same level as it

13 protects journalists and their speech and speech on

14 public affairs and speeches on political events.

15         Scientific speech and the ongoing dialogue that

16 scientists widely have, that computer revolution that we

17 have today, as the scientists say, and chilling that, by

18 forcing researchers to come into court and to present to

19 the other side in the court their research, the entire

20 sum body of their research authorities, will endanger us

21 all.

22         Now, I want to talk a little about the TRO

23 language and the specific preliminary injunction

24 language because one of the problems in the language

25 that is most troubling to us -- as I said, there are

three categories:  There's the stuff they don't want to
say, there's the nonpublic stuff that they do want to
say and there's the public stuff.  But the way that the
TRO is drafted, it says that anything that gives
material assistance to anyone in not paying their fare
on the T could -- is a violation of the injunction.

Well, this is an extremely vague term and I
think could easily reach a tremendous amount of ordinary
speaking that the clients want to do in order to explain
why it is they did what they did and the vulnerabilities
that they found.  So the injunction language that
they're proposing is actually quite vague and creates a
lot of uncertainty for the students even if it were to
be adopted by the Court, which we don't think it should
be.

Now, I want to address a couple of things that
counsel said in his presentation.  I'm happy to answer
questions, however, that the Court may have.  The first
thing I guess I want to talk about a little bit is that,
you know, counsel spent a lot of -- well, I guess the
first thing -- I'll go in order from the five points.  I
think that's probably the easiest way to do it.

The first issue is that -- the idea that the
information that's at issue here is that the MBTA still
doesn't know what the students know.  I think that

1    there's a serious First Amendment problem in ordering

2    the students as a condition of this lawsuit to divulge

3    everything that they may know as part of a preliminary

4    injunction.

5         What -- and there are several cases about this.

6    And I think the *Bextra* case and the *Cusumano* case are

7    cases that lay out exactly why such a requirement on the

8    students for providing their research materials and

9    their non-published information about their work would

10   create a chill on First Amendment speech, and that's why

11   *Cusumano* has to exist, to avoid this kind of free-form

12   inquiry into the research process.

13        I guess the second thing that I want to talk

14   about is the allegation that illegal conduct took place

15   here now.  I mentioned it briefly before, but I do want

16   to point out that that allegation is merely an

17   allegation and they have not provided anyone with any

18   information supporting that allegation.  And, indeed,

19   the allegation is somewhat vague about what it is they

20   think the students did and how it is they think they can

21   prove it.

22        But that is a mere allegation and it is not a

23   basis for a preliminary injunction.  And, indeed, even

24   if it was the basis for a preliminary injunction -- even

25   if it was the case that the clients engaged in illegal

behavior, which we firmly deny, that doesn't have
anything to do with the preliminary injunction they're
seeking here.  The preliminary injunction doesn't ask
that the students not engage in whatever illegal
behavior it is under whatever statute they think it is
they violated; the preliminary injunction prevents the
clients from speaking.

And so there's a disconnect between the harm
that they said that they found, the illegal behavior,
and the relief that they're seeking here with this
preliminary injunction.  And the First Amendment is very
clear that you should not punish someone for behavior
unrelated to speech by stopping their speech.

Next, counsel spent a lot of time talking about
the presentation materials, but I guess the thing that I
think is most important to observe from this is that the
DefCon presentation passed.  They did not give the
presentation.  And they have not stated, nor is there
any indication, that they're going to ramp up and give
this presentation any time again.  Instead, what they
did was, they provided you with a security analysis that
gives the four corners of what they want to say
publicly, and that's the analysis that has to be had
here, not whether some presentation that didn't happen
in the past or some random thing that, you know, was

1    part of that presentation that was clearly puffery by

2    20-year-old students should be the basis for a

3    preliminary injunction.

4         The students have now told you and the MBTA

5    exactly what they would like to say, and the only

6    question here is:  Is it speech and is it protected?  It

7    plainly is.  So a lot of time was spent on the

8    presentation and the other materials, but that's not

9    what the students want to do right now, and there's no

10   indication that they do want to do, and an injunction to

11   prohibit them from doing something that they don't want

12   to otherwise do is improper under the case law.

13        Counsel also spent a lot of time talking about

14   the communications between the students and DefCon, and

15   trying to make some intimation that because the students

16   were willing to tell the conference what it is they

17   wanted to say -- and they didn't get to finish it

18   because they didn't provide a lot of things to DefCon

19   because of the perfunkle that happened -- the

20   students --

21        What MBTA is asking here is exactly what the

22   Court rejected in the *Bextra* case, the case involving

23   New England Journal of Medicine.  In submitting articles

24   to the New England Journal of Medicine, I would bet that

25   a full copyright assignment is given to the New England

Journal of Medicine.  I believe that in submitting a
paper to the New England Journal of Medicine, an author
provides more information than just the paper itself,
but some of the supporting information.

        And in the *Bextra* case they talk about the
dialogue between the New England Journal of Medicine and
the researchers who are submitting their information to
be presented, in this particular instance in the journal
rather than a conference.  But the situation is directly
analogous.  The fact that the students were willing to
tell the publisher, or the vehicle for publishing their
information -- the information -- doesn't change the
research privilege.  It didn't change it in *Bextra*, it
certainly didn't change it in the *Cusumano* case where
clearly a lot of that information was given to the
publisher, and it shouldn't make a difference here.

        The presentation at DefCon was part of the
research; it was part of the publication of the
research.  And the research privilege is not waived by
giving the information to the publisher on your way to
publishing the information.  So I think that the New
England Journal of Medicine case, the *Bextra* case, is
actually on all fours with the students 'relationship
with DefCon here.  And just as the research privilege
should have prevented them from having to provide the

PDF created with pdfFactory trial version www.pdffactory.com

1  confidential materials there, the same should be the

2  case here.

3         Finally, counsel gave a characterization of the

4  facts that led us to today that I think I don't really

5  want to belabor and go through, but I think there is one

6  important piece of evidence that was presented by the

7  defendants last Thursday without comment, the

8  supplemental Sullivan declaration, that I think is

9  tremendously important because it demonstrates that the

10 MBTA wasn't really straight with Professor Goodlaw --

11 excuse me -- Judge Goodlaw about --

12         THE COURT:  Woodlock.

13         MS. COHN:  Woodlock.  Excuse me.  Jet lag is

14 starting to hit.

15         -- about what had happened.

16         What Sergeant Sullivan says in the second

17 declaration, which was omitted from the first

18 declaration that they presented to the judge last week,

19 is two things of tremendous importance.  First, he says,

20 "I told the students that they didn't have to give us

21 anything except for a confidential report which was due

22 in two weeks."  The students actually got that report to

23 them much sooner because they heard through their

24 professor that MBTA wanted the report much sooner than

25 the two weeks.

PDF created with pdfFactory trial version www.pdffactory.com

 1          But the students were asked to do one thing in

 2     person by a representative of the MBTA, and they did

 3     that one thing.  They met with the FBI.  They

 4     communicated with the FBI and the MBTA.  They were asked

 5     to do one thing and they did it.

 6          The other thing that is important is that nobody

 7     else from MBTA ever talked to the students.  As far as

 8     they knew, after they did this, they heard from their

 9     professor that they wanted the paper sooner, they got

10     the paper sooner, and they were good to go.  And without

11     any notice to them, and while clearly on notice that

12     they were out of state, the MBTA came to Judge Woodlock

13     and presented a version of the story that omitted that

14     they got -- that omitted this fact:  that nobody talked

15     to the students requesting anything else from Monday

16     until Friday, and that the Friday conversation that they

17     referenced was in the context of the MBTA telling the

18     students, after they learned through counsel from MIT

19     that they were being sued, that they should now turn

20     over the slides.

21          And I think it was completely legitimate and

22     appropriate for the students to wait and see what the

23     causes of action were against them before continuing to

24     try to cooperate with the MBTA because it was clear that

25     cooperating with the MBTA wasn't helping them.  And, you

1    know, in any event, the slides were withheld for less

2    than 12 hours, and they were ultimately presented.

3         So I think that the Sullivan declaration is

4    tremendously important because I think it changes -- it

5    very clearly supports the students' version of what

6    happened and it very clearly, I think, undermines the

7    MBTA's story that they repeatedly asked the students --

8    they asked the students many, many times for

9    information; the students refused to give it to them.

10   That's not what happened here.

11        Now, the MBTA tries to bolster this by saying,

12   "Well, maybe we didn't talk to the students, but we

13   talked to their professor.  We talked to Professor

14   Rivest."  But Professor Rivest isn't the agent for the

15   students.  They knew how to reach the students.  They

16   could have called them directly if they wanted more from

17   them.  And, you know, while Professor Rivest did ask

18   them to present their paper more quickly, they were not

19   told that they needed the slides; they were not told

20   that the MBTA wanted all of their presentation

21   materials.  The only person who talked to the students

22   before they rushed to court and filed suit and got an

23   injunction while the students were in Las Vegas is

24   Sergeant Sullivan.  And the last thing they heard from

25   him, "Everything's fine.  I believe you.  You guys

1  aren't going to be a problem.  I've seen all the DefCon

2  materials."

3       All these materials that counsel just walked you

4  through with great drama were all seen by the MBTA

5  before that Monday meeting -- actually, that's not true.

6  Those came later.  But they had seen the ad -- the

7  conference ad saying "This is what we're going to do at

8  the conference."  So they knew that the students -- what

9  the students were saying they were going to do when they

10 met with the students.

11      And I think the MBTA is trying to present the

12 students as somehow dragging their feet in terms of

13 trying to help the MBTA.  And that's not the case.  The

14 students are standing on their privileges and their

15 First Amendment rights.  That's appropriate.  You should

16 not waive those in this country.  But the students have

17 been trying, within the bounds of their own rights, to

18 help the MBTA.  And what they've gotten in response is a

19 litigation flurry the likes of which I think I've never

20 seen and a tremendous amount of pressure on them.  And I

21 think it's completely inappropriate and it's really time

22 for this to stop.  And the MBTA really ultimately is

23 trying to silence some uncomfortable truths that these

24 students uncovered.  They're trying to -- they want to

25 hide the fact -- they've wanted to hide all along the

fact that their fare system is broken, and rather than

respond the way that the transit authorities in London

and in Amsterdam did when similar security flaws were

brought to their attention, by taking the time and

addressing the problem, they're trying to sue the

messengers and they brought an action against three

college kids rather than addressing the problems in

their own house.

I'm going to conclude now. I'm happy to answer

some questions. But ultimately, your Honor, we believe

that the temporary restraining order should not be

converted to a preliminary injunction, it should be

dissolved immediately, and the case should go forward.

THE COURT: Mr. Swope?

MR. SWOPE: Thank you, your Honor. Good

afternoon.

The temporary restraining order doesn't run to

MIT, nor does the request for the preliminary

injunction; therefore, I only have 30 seconds of points

that I'd like to make to the Court, simply to correct

what might be the impression left by the plaintiffs'

briefs and comments today.

It was MIT who first contacted the T regarding

this matter. When the students contacted the Professor

Rivest, they asked him to call the MBTA. And it was

1    that call that generated the meeting on Monday which

2    you've heard so much about.

3           Professor Rivest is not the agent or authorized

4    spokesperson for the students.  These were kids who took

5    one class of his.  He's not their advisor; they're

6    simply students in his class.  He agreed to set up the

7    meeting.  When the T then called him afterward to say

8    that they wanted to reach the students who were at this

9    point dispersed around the country, he relayed the

10   message to those students, but he is not their agent nor

11   acting as their attorney in that regard.

12          THE COURT:  Mr. Mahony, I'll give you an

13   opportunity to respond.

14          MR. MAHONY:  Your Honor, just briefly.

15          A number of the MIT students' arguments that

16   turn on information provided, your Honor, for example,

17   the argument that the CharlieCard should be released

18   from any injunction.  Your Honor, based on the security

19   analysis, it's correct that the CharlieCard has not been

20   compromised.  But, your Honor, we still don't know --

21   again, it's the same old concern:  We don't know that

22   additional information that the students declined to

23   share.

24          Your Honor, with respect to that additional

25   information, it's difficult to envision the purpose

1   served by advertising, as they did in the initial

2   announcement.  "We present several attacks to completely

3   break the CharlieCard."  That's what they've advertised.

4   And that remained in the second announcement:

5   "Completely break the CharlieCard."  To make those

6   statements, and then when they say "We've given you

7   everything we want to talk about publicly.  There's

8   other stuff that we could talk about but we don't want

9   to talk about but we're not going to tell you what that

10  is," and for us to have that concern of "completely

11  break the CharlieCard" as they've claimed, when they

12  won't provide even in a confidential structure -- we

13  have a protective order that we've provided to opposing

14  counsel to try to work this out -- it's hard to fathom

15  what the reasons are.

16          Your Honor, in terms of the claims that the

17  illegal activity is conclusory, your Honor, we are happy

18  to provide discovery on that point, attorneys' eyes

19  only, and after we've had a chance to depose the

20  students so we're clear about who said what to whom.

21  But, your Honor, that information is solid information.

22  We've provided a thinner version for public consumption

23  because the more that's discussed about the audit trails

24  and the protections, the more unfriendly hackers know

25  about the system.  But, your Honor, understand that that

1    is solid information and my sister is incorrect.

2           Finally -- actually, two points, your Honor.  My

3    sister has said, "Court, be careful.  If you continue

4    the injunctive relief, researchers will be afraid.  They

5    won't research here anymore."

6           Your Honor, I submit well-tailored relief here

7    will set the rules, will settle expectations, will

8    remove the fear on both sides -- perhaps researchers are

9    afraid.  But I can tell you, your Honor, entities that

10   rely on computer networks are pretty afraid as well.

11   Your Honor, we need some civil, responsible structures

12   here in place.

13          The students had their presentation and knew

14   they were going to present it for two and a half months

15   before they went to the T.  Is that responsible?  Do we

16   want to say to researchers who know flaws in computer

17   networks:  It's okay to take two and a half months

18   before you go, and then give less than ten days, and

19   then want to disclose everything all over the world?

20   Your Honor, that's not rational structure at all.

21          We need to balance the interests.  We need to

22   protect the fears of the researchers, absolutely.  They

23   perform an incredibly valuable function.  Your Honor,

24   I'm not underestimating when I say the students in their

25   security analysis perform valuable function.  That's

1  value, your Honor.  But we don't want to discount the

2  fear that the network owners also have of researchers

3  acting irresponsibly.

4        Your Honor, the last point was, my sister said

5  it's time to stop.  Your Honor, we have offered to

6  mediate on many occasions.  We have offered to discuss

7  settlement on several occasions.  Even yesterday we

8  presented two offers.  So the statement to the Court

9  that it's time to stop coming from the MIT students

10  seems out of place.

11        Thank you, your Honor.

12        THE COURT:  Okay.  Well, it hardly needs

13  repeating here, I guess since it's been repeated

14  already, repeatedly, what the test is for a preliminary

15  injunction:  the familiar four steps that the party

16  seeking a preliminary injunction, as with a TRO, must

17  show a likelihood of success on the merits of the

18  underlying claim, the prospect that in the absence of

19  that relief there would be, if not immediate, at least

20  imminent harm that would be irreparable, it is a term of

21  art which the law classifies certain inadequacy of other

22  remedies.

23        The test recognizes that there are, as in any

24  lawsuit, competing interests that can be affected by the

25  judgments, and that the balance shouldn't weigh in favor

1    of the party seeking the restraint.  And finally, public

2    interest is to be taken account of in light, I think, of

3    disposition of the other factors.  So let me try to

4    address those in summary fashion.

5         First is the likelihood of success on the

6    merits.  In many cases I've noted from the circuit and

7    elsewhere, this is the most fundamental criterion for

8    establishing a case for a preliminary injunction, and as

9    the First Circuit has said, it's the sine qua non

10   element of preliminary injunction.

11        Plaintiff's claim here, as I understand it, is

12   that the Computer Fraud and Abuse Act, as codified at 18

13   U.S. Code Section 1030, was violated, or was threatened

14   to be violated.  And the section of that statute that

15   the plaintiffs rely on is Subsection (a)(5)(A)(i).  Let

16   me note that that claim of a past, present or future

17   violation of the federal statute is the basis for

18   federal jurisdiction on this case.  The federal

19   courts -- of course courts have limited jurisdiction.

20   And as I understand the papers, the plaintiff relies on

21   its claim arising under the CFAA to be the basis for

22   this Court's jurisdiction.

23        There are some state law claims that are

24   included in the complaint and, if anchored to a federal

25   basis for jurisdiction, might also be heard, but I don't

1  understand that any of the claims that we've been -- or

2  issues that we've been addressing rest on any of those

3  state claims; it's federal claims exclusively.  And

4  that's the same now as it was at the outset.  It's the

5  pleading; the complaint frames the pleading.  And I

6  guess the issue that was -- it was the way that the

7  issues were addressed initially before Judge Woodlock in

8  the motion for a TRO, and as I understand it continues

9  to be the case.

10       And I think to keep the focus -- I mean, many

11  people have different interests in the broad issues at

12  stake here.  My interest is rather limited in that I

13  have a federal statute that is claimed to be violated

14  and a particular legal remedy is sought.  So I

15  appreciate the breadth of views of others, but my view

16  is considerably more focused on the issues that are

17  presented by the lawsuit.

18       Now, let me also say that there had been a

19  number of motions and other papers filed in the course

20  of the last ten days or so, and there is an outstanding

21  issue concerning the discovery order that was made last

22  week.  I think it's not necessary on this occasion to

23  resolve that because I think it can be, for present

24  purposes, sufficient to infer or assume, either way,

25  that information in the possession of defendants might

1   in some ways -- if publicized, might in some ways
2   facilitate, in ways that I can't be specific about, the
3   cloning or forging of CharlieTickets.  I'll assume that
4   the information that it might do that has not been
5   disclosed.  I don't think it matters for present
6   purposes because I think that for other reasons based on
7   the claim that is made the MBTA has not shown the
8   likelihood of success to the merits of the CFAA claim,
9   which is, as I say, based on 1030l(a)(5)(A)(i).
10          And specifically, I think I'm actually in
11  agreement with the argument made this morning by the
12  defendants, and that is that the -- it is likely -- this
13  is not a definitive resolution of the construction of
14  the statute -- but let me just even back up to that
15  statement.
16          The issue presented first, it seems to me, is a
17  question of statutory construction rather than a
18  question of the constitutional conventions.  Counsel
19  pointed out the statutes are to be construed consistent
20  with the Constitution, if possible, and construction
21  that would raise constitutional issues are generally
22  avoided, if possible.  That's true.  I think it is also
23  true that if there is a statutory answer to a question
24  that we need not reach, that we can prescind from
25  reaching constitutional questions if the issues

1    presented can be resolved on constitutional grounds.

2    And I think that's the case here that's central.

3          So I agree with the argument by the defendants

4    that the construction of the statute argued for by the

5    plaintiff that the "transmission" information, according

6    to the section under the statute, by publication to an

7    audience is not likely the correct construction of that

8    provision of the statute.

9          First of all, I agree simply as a matter of

10   examination of the language and syntax.  I think there's

11   a point maybe not made this morning with quite the same

12   precision but it was in one of the briefs that the

13   placement of the comma before the phrase "to a protected

14   computer" at the end of the phrase suggests that not

15   only the nearest clause, but a more remote clause, is

16   associated with that qualification to a protected

17   computer; and in particular, that is the offense

18   described here, is that a person commits the offense if

19   the person knowingly causes the transmission of a

20   program to a protected computer -- programmed

21   information -- to a protected computer.  I think that is

22   a completely orthodox syntactical reading of the

23   section.  And if that's the case, it's unusual for us to

24   try to find otherwise.

25          I note also that the word "information" relied

PDF created with pdfFactory trial version www.pdffactory.com

on by the plaintiff is used in association with the
words "program code" and "command" which tend to be more
technical terms, suggesting that information is an
entity of the same order of information as codes,
commands and programs.  And I'm not suggesting that this
is, in fact, a transmission of information to a computer
that is being addressed rather than, obviously, to an
audience.  And I think these interpretations of the
statutory language are consistent with what relatively
minor guidance we can get from the legislative history
which suggests that this particular provision was aimed
primarily, at least, at things such as viruses and worms
that could be introduced by transmission to a protected
computer.

So I think that the match between the giving of
a public lecture or publishing in written form
information, that behavior, the language of the statute,
isn't sufficiently present for me to conclude there's a
likelihood of success on the merits of that claim.

I would also say that -- although this hasn't
been a primary focus here, that I think there is a
substantial question about whether the $5,000 loss
figure in (5)(B)(i) would be satisfied under these
circumstances.  I think there's speculation about how
high loss could be if the loss were to be characterized

1   as loss of revenue from people using unauthorized,

2   forged, cloned, whatever, manipulated cards.  The extent

3   to which the teaching of the defendants' project would,

4   in the real world, produce forgery of the kind necessary

5   to get to $5,000 I think is a matter of possibility but

6   I don't think it has been sufficiently established to

7   support the injunction requested.

8           I think -- that's the key, obviously.  I think

9   there are other problems with other steps.  There's a

10  question whether there's a sufficient reason to believe

11  that there is likely imminent or irreparable harm.

12  There's some issue as to what information will be

13  produced and how harmful it will be, whether the

14  defendants will release certain key information or

15  nonpublic key information or not.

16          I think -- particularly in light of changed

17  circumstances, I think the very publicity that's been

18  attendant upon the case may change that likelihood from

19  what it was when there was a scheduled conference

20  appearance.  And so I think that's less clear in the

21  plaintiff's favor than perhaps it was even at the time

22  of the original filing.  And there remains also in the

23  area of speculation, I think, whether any damaged remedy

24  could be deemed adequate or not.

25          As I said earlier, in any case there's competing

interests and there are winners and losers and there are
harms that occur and don't occur.  And so the balance --
there are things to be said on both sides about what
might happen in either event, either the granting or
denial.  Essentially for the reasons I've already
described with respect to the information bearing on
whether there's likelihood of immediate irreparable
harm, I think the balance is hard to assess as well, and
it falls to the party seeking the matter to more than
show it's an issue, to show it's an issue that cuts in
their favor.

        So there's obviously interest in protecting the
integrity of the fare system, in avoiding major loss to
the MBTA.  That's certainly legitimate harm to be
concerned about.  There's an interest and a potential
harm to persons in the position of the defendants
regarding their ability to engage in public discussions
about these matters.  And I make that point in the first
instance without reference to the First Amendment, what
it may or may not guarantee under these circumstances;
that is, I think the harm exists as a practical matter
without consideration of whether it's something that
also implicates the person.  In other words, I think
this matter can be resolved without resort to
constitutional principles at this stage.

PDF created with pdfFactory trial version www.pdffactory.com

1          And finally, public interest.  Again, there's an

2     ambiguity.  Obviously, the public has some interest in

3     the integrity of public institutions and systems such as

4     the MBTA in avoiding losses that will -- if they occur,

5     will likely be borne by innocent third parties such as

6     other properly paying MBTA riders and perhaps even the

7     general taxpayers.  That's not an inconsiderable

8     interest.  On the other hand, there's a public interest

9     in frank debate and truth-telling about weaknesses in

10    public systems so they can be improved.  So I think that

11    factor comes out to be a wash.  But the overriding one,

12    I think, is that here in a federal court there must be a

13    federal claim that is sufficiently viable to justify

14    orders supposed -- where they are needed.

15          Now, let me just note that a lot of reference

16    has been made to illegal behavior.  And sort of a

17    general term, for purposes of establishing what needs to

18    be established here, the illegal behavior has to mean

19    illegal in the sense that it is a violation of federal

20    law, particularly, the CFAA.  And for the reasons I've

21    said, I don't think that's been shown.

22          So the fact that there might be other illegal

23    behavior in violation of state law -- for example,

24    theft, damage to property, things that arise under the

25    common law -- I don't think that's significant under

PDF created with pdfFactory trial version www.pdffactory.com

1  this kind of a claim, and so any -- I don't say that the

2  facts might not show that there was some illegal

3  behavior in terms of getting free rides or whatever, but

4  the key is whether that was a violation of federal law

5  to support a federal court's jurisdiction and order.

6       So in summary, then, those are the, I think,

7  significant reasons.  And as is obvious, I conclude the

8  plaintiff has not satisfied the prerequisites for a

9  preliminary injunction, so the motion for a preliminary

10 injunction is denied.

11      I referred earlier to what the life of the TRO

12 is.  I think that it apparently has life beyond this,

13 but obviously for the same reasons that I would deny the

14 motion for the preliminary injunction, I will dissolve

15 the existing TRO at this point.

16      I think it was Miss Cohn who said the case goes

17 on, it does, and we'll see what happens next, all right?

18      We'll be in recess.

19      THE CLERK:  All rise.

20      (The proceedings adjourned at 12:49 p.m.)

21

22

23

24

25

1                C E R T I F I C A T E

2

3         I, Marcia G. Patrisso, RMR, CRR, Official

4    Reporter of the United States District Court, do hereby

5    certify that the foregoing transcript constitutes, to

6    the best of my skill and ability, a true and accurate

7    transcription of my stenotype notes taken in the matter

8    of Civil Action No. 08-11364-GAO, MBTA v. Zack Anderson,

9    et al.

10

11                        /s/ Marcia G. Patrisso
                         MARCIA G. PATRISSO, RMR, CRR
12                       Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25